Grace E. Parasmo (SBN 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
8149 W. Santa Monica Blvd., #611
Los Angeles, California 90046
Telephone:  (646) 509-3913

Attorneys for Plaintiffs S.A., S.S., A.S.
and M.F., individually, and on behalf of
a class of similarly situated individuals

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

S.A., S.S., A.S., and M.F., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATURALCYCLES USA CORPORATION, AND NATURALCYCLES NORDIC AB,

Defendants.

Case No.

**CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL**

1

Plaintiffs S.A., S.S., A.S., and M. F.[1] ("Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows based on personal knowledge of their own acts and observations and, otherwise, upon information and belief based on investigation of counsel.

## I.  NATURE OF THE CASE

1.      This class action arises out of Defendants NaturalCycles USA Corp. and NaturalCycles Nordic AB's ("Natural Cycles" or "Defendants") systematic collection, use, and disclosure of consumers' most intimate reproductive and sexual health information—including pregnancy status, menstrual cycle data, fertility goals, sexual activity, contraceptive use, medical conditions, and detailed bodily symptoms—to third party advertising, analytics, and social media companies, for commercial gain, without proper authorization and consent.

2.      Natural Cycles markets its fertility tracking and digital birth control application as a privacy-protective, FDA-cleared medical device for natural birth control and fertility tracking. It assures users that their sensitive health information will remain confidential, will never be shared with third parties without consent, and that unlike "free" apps that monetize users' data, Natural Cycles charges a subscription fee specifically to protect data privacy.

3.      Yet Defendants engineered their website and mobile application to embed hidden tracking technologies of Mixpanel Inc. ("Mixpanel"), an analytics and behavior advertising platform, AddShoppers, Inc., a behavioral retargeted and cross-site surveillance network ("AddShoppers") Google LLC ("Google"), a digital advertising company, and TikTok, Inc. ("TikTok"), a social media platform, and other entities.  These tracking tools operated as surveillance mechanisms, capturing users' personally identifiable information linked to users' reproductive and sexual health data in real time and transmitting them to third parties.

_____
[1]      Plaintiffs bring their claims under a pseudonym to protect against further disclosure of the private and highly sensitive reproductive and sexual health information which they disclosed to the Natural Cycles fertility application, which is protected under the California Confidentiality of Medical Information Act (the "CMIA"), California Civil Code, Section 56.10.  Revealing their true identities would substantially cause the exact harm they seek to remedy through the filing of this suit, *i.e.*, the disclosure of their personal and sensitive reproductive and sexual health information.

4.    Mixpanel's tracking technology fires at every stage of user interaction, beginning with the onboarding questionnaire where users disclose deeply personal reproductive and sexual health information.  Mixpanel receives various categories of identifying data, including: (1) users' detailed onboarding answers, including name, age, email, fertility goals, birth control methods, hormone therapy, side effects, and medical conditions such as polycystic ovary syndrome, endometriosis, and thyroid disorders; (2) full page URLs revealing whether a user is pregnant, postpartum, planning pregnancy, preventing pregnancy, or experiencing perimenopause; and (3) persistent device identifiers that enable tracking across sessions and devices. This extensive data collection occurs ***even when users explicitly reject non-essential cookies through Natural Cycles' cookie consent banner.***

5.    After onboarding, Mixpanel also receives real-time event data for virtually every in-app interaction, including daily menstrual cycle entries, menstrual symptoms, ovulation and fertility predictions, sexual activity logging, pregnancy test results, and daily fertility status determinations. Together, these transmissions provide Mixpanel with a continuous, granular, and identifiable record of users' complete reproductive health journeys—from initial fertility goals through ongoing menstrual cycles, contraception, conception attempts, pregnancy, postpartum, and perimenopause.

6.    AddShoppers receives full page URLs that reveal users' reproductive health status and fertility goals, along with referrer data, device characteristics, IP addresses, and persistent tracking identifiers—***even when users reject non-essential cookies through Natural Cycles' cookie consent banner***.  AddShoppers operates a commercial email marketing network with a database of over 175 million consumer email addresses. AddShoppers matches users' fertility-related browsing activity on Natural Cycles against this database, which enables Natural Cycles and other brands to send targeted marketing emails based on users' reproductive health information..

7.    Google receives full page URLs, page titles, and navigation paths that reveal reproductive health status and fertility goals, in real time as the user progresses through the onboarding questionnaire, along with device metadata, persistent tracking identifiers, and Google

account cookies.  These data points enable Google to link fertility and pregnancy related browsing activity with specific identifiable individuals.

8.     TikTok receives full page URLs, page titles, and navigation paths that reveal reproductive health status and fertility goals, in real time as the user progresses through the onboarding questionnaire.  These transmissions are tied to session identifiers, persistent tracking cookies, device fingerprints, and IP addresses, allowing TikTok to link individuals with fertility or pregnancy related behavior for advertising and profiling purposes.

9.     The disclosed data is extraordinarily valuable in the digital advertising industry. Pregnancy and fertility related information commands premiums far exceeding the value of ordinary consumer data because it enables precise targeting of consumers at critical life stages associated with high purchasing intent.  Natural Cycles and its third-party partners capitalized on this value by enabling behavioral advertising, audience segmentation, cross-device tracking, marketing optimization, and product recommendations derived from users' most intimate reproductive health information.  These disclosures were willful, unauthorized, and made for Defendants and their partners' commercial benefit.

10.     Defendants' violations are systematic and ongoing. Natural Cycles embedded third-party tracking code throughout its platform, including trackers that fire automatically, with each user interaction, continuously transmitting reproductive health information to third parties without users' knowledge or consent.

11.     These practices violate fundamental privacy protections.  Natural Cycles is a "reproductive or sexual health digital service" and a "provider of health care" under the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10 ("CMIA"), and thus prohibited from disclosing reproductive and sexual health information to third parties or using such information for marketing purposes, without explicit authorization.  Natural Cycles also violated multiple, independent provisions of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq., by enabling third-party interception of users' communications. Plaintiffs further assert claims for invasion of privacy and violations of Article I, § 1 of the California Constitution.

12.      Plaintiffs, on behalf of themselves and members of the classes they seek to represent, seek restitution, declaratory, injunctive, and other equitable relief, statutory damages, actual and punitive damages, reasonable attorneys' fees and costs, and interest, and additional relief as the Court deems appropriate.

## II.  PARTIES

### A.  **PLAINTIFFS**

13.      Plaintiff S.A. is an individual residing in Moreno Valley, California who interacted with the Natural Cycles website and mobile application while located in California.

14.      Plaintiff S.S. is an individual residing in Los Angeles, California who interacted with the Natural Cycles website while located in California.

15.      Plaintiff A.S. is an individual residing in Oakland, California who interacted with the Natural Cycles website and mobile application while in California.

16.      Plaintiff M.F. is an individual residing in Walnut Creek, California who interacted with the Natural Cycles website and mobile application while located in California.

### B.  **DEFENDANTS**

17.      Defendant Natural Cycles USA Corp. is a Delaware corporation with its principal place of business in New York, New York. It sells subscriptions and other consumer-facing products related to the Natural Cycles platform in the United States, including marketing, billing, customer service operations, and the online shop for U.S. customers. As of December 2025, Natural Cycles claims more than 4 million registered users and over 13 million analyzed menstrual cycles.[2]

18.      Defendant Natural Cycles Nordic AB is a Swedish corporation located in Stockholm, Sweden.  It develops and maintains the software known as the "Natural Cycles" mobile and web app, it holds regulatory clearances (including FDA clearance) for the app as a Class II medical device in the U.S., and coordinates global product development and distribution of the app.  The Natural Cycles mobile app is available on iOS and Android devices with Natural Cycles Nordic AB listed as the developer and owner of the applications in both the Apple App Store and Google Play

---

[2]      About Natural Cycles, https://www.naturalcycles.com/about

1  store.

2  19.    At all relevant times, Defendants NaturalCycles USA Corporation and NaturalCycles

3  Nordic AB operated as a joint enterprise and acted in concert to develop, market, operate, and

4  monetize the Natural Cycles application and services.  Upon information and belief, Defendants

5  jointly made decisions regarding the implementation of tracking technologies, the disclosure of user

6  data to third parties, and the representations made to users regarding data privacy and security.

7  20.    Natural Cycles systematically and continuously does business in California,

8  including with California residents. Natural Cycles also targets the geolocation of its users and

9  knew that the device Plaintiffs and Class Members used were in California, when Natural Cycles

10  surreptitiously implanted cookies on Plaintiffs and Class Members' devices, tracked their physical

11  location, and collected data regarding Plaintiff's fertility and sexual health and then shared that data

12  with unauthorized third parties, including Mixpanel, Addshoppers Inc., Google, TikTok (and others)

13  for its own commercial benefit.  As alleged herein, some of these unauthorized third parties use this

14  data for their own financial purposes and targeted advertising.

15  21.    Natural Cycles operates an integrated "webshop" (on the same website where users

16  fill out the onboarding questionnaire and enter their most sensitive health data).[3]  Through this

17  integrated webshop, Natural Cycles directly sells products precisely targeted to users' reproductive

18  health status, cycle phase, pregnancy status, and fertility intentions, including vibrators, condoms,

19  personal lubricants, pregnancy tests, ovulation tests, hair growth supplements, digital smart

20  thermometers, tampons, menstrual pads, menstrual cups and discs.[4]  Based on the surreptitious

21  third-party tracking of menstrual cycle data, pregnancy status, sexual-activity logging, and fertility

22  intentions, Natural Cycles is able to target and specifically recommend and sell these products to

23  California consumers.

24  22.    During the relevant period, Natural Cycles privacy policy has provisions and

25  includes rights in place specific to California users of the website and mobile application. Natural

26

27  [3]    NC Shop: Products to support every phase of your cycle,
https://www.naturalcycles.com/shop/row

28  [4]    *Id*.

Cycles also asserts in its policy that it complies with certain California privacy laws, such as the California Consumer Privacy Act.

## III.  JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C., § 1332, as amended by the Class Action Fairness Act of 2005, in that the aggregate claims of Plaintiffs and the proposed class members exceed the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and Defendants are citizens of different states/countries.

24.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

25.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

26.    Intradistrict Assignment: A substantial part of the events and omissions giving rise to the violations of law alleged herein occurred in the Counties of Alameda and Contra Costa, and as such, this action may properly be assigned to the San Francisco or Oakland divisions of this Court pursuant to Civil Local Rule 3-2(c) and (d).

## IV.  FACTUAL ALLEGATIONS

### A.    Overview of the Natural Cycles Fertility and Digital Birth Control App

27.    The Natural Cycles fertility and digital birth control application is a mobile application available on the Google Play Store and the Apple App Store and is offered exclusively by paid subscription (the "App"). Natural Cycles also maintains a web application at signup.naturalcycles.com, a browser-based interactive platform through which users complete the onboarding questionnaire and can choose to begin the subscription process.

28.    The App is marketed as a hormone-free natural method of contraception and fertility

tracking.[5]  The App also markets itself as a medical device alternative to hormonal birth control and other traditional contraceptive methods.[6]

29.    Natural Cycles encourages users to input highly sensitive reproductive health information on a daily basis, including basal body temperature, menstrual cycle data, symptoms, sexual activity, and pregnancy test results.[7] Natural Cycles claims to use this sensitive health data to determine fertile and non-fertile days and provide contraception guidance.[8]

30.    The App operates in multiple modes—each tailored to a different phase of a user's reproductive journey:

- **NC° Birth Control**: the default mode for users seeking to avoid pregnancy, which issues daily fertility classifications (e.g. "red days" and "green days") to guide use of protection or abstinence;

- **NC° Plan Pregnancy**: mode for users attempting to conceive, which focuses on pinpointing peak fertility windows;

- **NC° Follow Pregnancy**: once a user becomes pregnant, this mode tracks ongoing pregnancy status and supports monitoring through gestation;

- **NC° Postpartum**: for new mothers, offering recovery and cycle resumption support after childbirth; and

- **NC° Perimenopause**: designed for users approaching or experiencing menopause, this mode supports symptom tracking and hormonal changes typical of perimenopause and menopause.[9]

31.    In each mode, Natural Cycles prompts users to input data about their sexual practices, libido, mood swings, emotions, cervical mucus, pain, cycle regularity, fertility and pregnancy tests, medical conditions, and other sexual intercourse data, birth control choices, and reproductive-health details.

32.    In 2018, the FDA granted Natural Cycles 510(k) clearance as a Class II medical

---

[5]    Birth control built around you, https://www.naturalcycles.com
[6]    *Id.*
[7]    How does Natural Cycles work, https://www.naturalcycles.com/how-does-natural-cycles-work
[8]    *Id.*
[9]    *Id.*

device for use as a digital birth control method.  Natural Cycles promotes this regulatory status as evidence that it is a science-based, clinically validated product subject to regulatory oversight and cybersecurity standards.  According to the company:

> [W]e are a regulated medical device. Not only do we regularly publish studies on the effectiveness of our product, and undergo regular audits, but we have rigorous processes in place that protect our users and their data. [10]

33.     Natural Cycles also publicly promotes a "Medical Advisory Board" composed of gynecologists, fertility specialists, and menopause experts, emphasizing its scientific branding and medical credibility: "[a]s a company grounded in science, we're thrilled to have a Medical Advisory Board made up of distinguished healthcare professionals who help drive our mission forward".[11]

34.     Before subscribing, users must complete an extensive onboarding questionnaire that requires them to answer a series of detailed and intimate questions about their reproductive health, sexual activity, fertility goals, medical history, and personal lives.

35.     During the onboarding questionnaire, Natural Cycles assures users that it "keeps your data safe[;]" it tells users they are covered by Natural Cycles' "advanced data protection at all times."



**Natural Cycles°**

**Natural Cycles keeps your data safe**

You're covered by our advanced data protection at all times. Read our Privacy policy to learn more.

Next

*Figure 1: Screenshot from Natural Cycles' Onboarding Questionnaire*

36.     The onboarding questionnaire prompts disclosure of personally identifiable information and sensitive reproductive and sexual health information, including but not limited to:

---

[10]     https://www.naturalcycles.com/the-science
[11]     Natural Cycles Medical Advisory Board, https://www.naturalcycles.com/advisory-board

name, age, email, height, weight, fertility goals, contraception method, side effects from hormonal contraceptives, medical conditions affecting the menstrual cycle (such as polycystic ovary syndrome (PCOS), endometriosis, thyroid disorders), prior pregnancies, the use of other fertility-tracking apps, sexual activity, pregnancy status, data of last menstrual cycle, length of menstrual cycle, menstrual flow, menstrual symptoms, perimenopause status, perimenopause symptoms, hormone therapy use, postpartum status, and other highly sensitive health information.

37.    Examples of onboarding questionnaire screenshots are shown below:

 

*Figure 2: Selected Screenshots from Natural Cycles' Onboarding Questionnaire*

38.    The user can complete the onboarding questionnaire on Natural Cycles' website or within the App before they create an account and purchase a subscription.

39.    The onboarding questionnaire is based on the user's selected fertility goal/reproductive health status (e.g., "prevent pregnancy", "get pregnant faster," "recover from childbirth," "track my cycle," "decode perimenopause," "track my pregnancy").

40.    Once subscribed, users are encouraged to input and update, on a daily basis,

additional intimate reproductive and sexual health data.  Natural Cycles refers to these inputs as "trackers," which are recorded manually, with users pressing a button for each tracker to input highly granular, day-to-day information.

41.     Figure 3, below, contains screenshots of the "trackers" dashboard where a user logs their menstruation and associated reproductive and sexual health data on a daily basis by clicking on the "tracker" buttons.  A user can import their basal body temperature measured on a Bluetooth thermometer sold by Natural Cycles.[12]

  

***Figure 3: Screenshots of Trackers Screen in the Natural Cycles' Mobile App***

42.     Users are also encouraged to upload images of ovulation, emergency contraception, and pregnancy tests and to input any notes about how they are feeling that day.

43.     Users located in California, including Plaintiffs and Class Members, have disclosed extensive reproductive health, sexual activity, emotional and physical health, medical conditions, and lifestyle information based on the company's assurance that their intimate reproductive health

---

[12]     https://www.naturalcycles.com/shop/nc-thermometer-gen3

data would remain private and would never be shared with third parties.

44.    In fact, Natural Cycles tells potential customers that what makes the Natural Cycles app different from others is "not all period trackers keep secrets — some might even share them. With the Natural Cycles app, your data stays yours."[13]

45.    Unbeknownst to Plaintiffs and Class Members, Natural Cycles has amassed vast troves of deeply intimate reproductive and sexual health data tied to personally identifiable information and has disclosed this data to third parties.  It has accomplished this by surreptitiously embedding tracking technologies on both its website and mobile applications.

    **B.    Natural Cycles Programmed Its Website and Mobile Apps to Include Hidden Tracking Code That Collects and Transmits Users' Sensitive "Reproductive and Sexual Health Application Information" Under CMIA to Third Parties for Analytics and Advertising Purposes**

       **1)    Mixpanel's Hidden Tracking Code**

46.    Mixpanel is a product analytics platform that enables companies to track user behavior, create detailed user profiles, and segment audiences for marketing purposes.[14] Mixpanel's business model centers on collecting detailed behavioral data about users and providing tools that allow companies to leverage that data for user engagement, targeting, retention, and monetization strategies.[15]

47.    Mixpanel is designed to track users across websites, applications, and devices for purposes of engagement measurement, attribution modeling, audience segmentation, and advertising performance.[16]

48.    Mixpanel markets its platform to businesses as a tool to "drive engagement beyond

---

[13]    Birth control built around you,https://www.naturalcycles.com
[14]    What is Mixpanel?, https://docs.mixpanel.com/docs/what-is-mixpanel; What is behavioral segmentation?, https://mixpanel.com/blog/behavioral-segmentation/; What is customer analytics, https://mixpanel.com/blog/what-is-customer-analytics/; Mixpanel Marketing Analytics, https://mixpanel.com/m/mixpanel-marketing-analytics/.
[15]    *Id*.
[16]    Drive product success with actionable user insights, https://mixpanel.com/platform/product-analytics/; Mixpanel Marketing Analytics, https://mixpanel.com/m/mixpanel-marketing-analytics/.

traffic," "maximize your marketing performance" and "optimize ad spend" using "real-time insights into user behavior."[17]  Mixpanel instructs clients to "follow users across channels with cross-platform tracking," "monitor metrics and campaign performance," and make rapid data-driven decisions about how to target and engage users.[18]

49.    Mixpanel's marketing materials emphasize cross-device identity resolution—"ID Merge to combine cross-device activity"—and the ability to "unify your data and get the full story" by combining website, app, and customer data platform inputs into a single user-level profile.[19]

50.    Mixpanel's platform supports cross-device and cross-session identity resolution, enabling data from a user's device to be merged into a single profile through device identifiers, browser fingerprinting, ID stitching, and cookie-based syncing.[20]

51.    Natural Cycles embedded Mixpanel's third party analytics tracking code, including Mixpanel's client-side JavaScript event-tracking scripts into the Natural Cycles onboarding webpages.  When a user loads an onboarding page, these scripts automatically begin running in the background.[21]

52.    Mixpanel's tracking code assigns each user a unique device identifier (the Mixpanel $device_id) and causes the Natural Cycles website to set a persistent Mixpanel cookie[22] on the user's device.[23]  This cookie stores the $device_id, Mixpanel's user identifier ($distinct_id)[24], and

---

[17]    Drive Engagement Beyond Traffic, https://mixpanel.com/teams/marketing-teams/.
[18]    *Id.*
[19]    *Id.*
[20]    *Id.*
[21]    Events: Capture behaviors and actions, https://docs.mixpanel.com/docs/data-structure/events-and-properties
[22]    A browser cookie is a small piece of information left on a visitor's computer by a website, via a web browser.  See https://developer.mozilla.org/en-US/docs/Glossary/Cookie.
[23]    Mixpanel assigns a "$device_id" to every user who interacts with a client's website or application. This identifier is automatically generated by Mixpanel's SDK and appended to every event the user generates. Identifying Users (Simplified), https://docs.mixpanel.com/docs/tracking-methods/id-management/identifying-users-simplified
[24]    "Distinct ID is Mixpanel's identifier used to uniquely track a user in the system. Identity Management Overview, https://docs.mixpanel.com/docs/tracking-methods/id-management.

referrer metadata[25].  The $device_id and the $distinct_id—alone or in combination—are personally identifiable information because they reliably distinguish, recognize, and re-identify a specific user and their device across sessions, pages, and devices.[26]  The Mixpanel cookie supports the tracking code by storing these identifiers and transmitting them directly to Mixpanel's servers, enabling Mixpanel to track users across interactions and maintain persistent user-level profiles over time.

53.      Mixpanel's tracking scripts record and transmit user interactions, including but not limited to, page views, button clicks, form navigation, and the content of onboarding answers.  This data is transmitted via POST requests[27] to the Mixpanel-controlled domain api-js.mixpanel.com. These transmissions contain substantive onboarding questions and answers even where users rejected non-essential cookies and explicitly opted out of analytics tracking.

54.      Through this tracking code, Mixpanel received granular, event-level data revealing users' reproductive health and other sensitive reproductive health information disclosed in response to Natural Cycles' onboarding questions.

55.      Mixpanel's POST requests include the following categories of sensitive information, each tied to the "$device_id," the "$distinct_id," and extensive browser fingerprinting data (browser type and version, operating system, and screen resolution):

_____

[25]      The referrer header contains that URL of the previous webpage from which the current webpage was followed.  *See* https://developer.mozilla.org/en-US/docs/Web/HTTP/Reference/Headers/Referer

[26]      Every event data and profile update sent to Mixpanel should have a distinct_id property associated with it…The purpose of Distinct ID is to provide a single, unified identifier for a user across devices and sessions…" allowing Mixpanel to consolidate all activity under one user record. The "$distinct_id" is therefore a persistent personal identifier.  Identity Management Overview, https://docs.mixpanel.com/docs/tracking-methods/id-management.

      When an event contains a $device_id but does not contain a separate user identifier, Mixpanel automatically promotes the $device_id to serve as the user's $distinct_id, meaning that Mixpanel treats the device identifier itself as the user's primary identity key.  Identifying Users (Simplified), https://docs.mixpanel.com/docs/tracking-methods/id-management/identifying-users-simplified

[27]      In a POST request, a web browser sends a request to upload information to a website's server. https://developer.mozilla.org/en-US/docs/Web/HTTP/Reference/Methods/POST.

**(a) Behavioral and Navigation Metadata**
- Complete URLs of onboarding pages visited (including pages revealing sensitive health and reproductive information)
- Referrer and referring domain
- Event timestamps
- Insert ID (unique event identifier)
- View type (e.g. website)
- Repo value (indicating the type or flow of the signup/onboarding questionnaire the user is in)

**(b) Substantive Onboarding Questions and Answers**
- Name (e.g., "Jane Doe")
- Age range (e.g., "thirties")
- Fertility goal (e.g., "prevent")
- Birth control method (e.g., "pill")
- Side effects of birth control (e.g., "weightGain")
- Duration on hormonal birth control (e.g., "moreThanAYear")
- Medical conditions affecting menstrual cycles (e.g., "PCOS")

56.    Natural Cycles internally labels these transmissions as "OnboardingAnswer." For instance, when asked "Do you have any medical conditions that can affect your cycle?" and the user selected Polycystic ovary syndrome ("PCOS"), Natural Cycles transmitted both the question and the user's selected answer in clear text to Mixpanel's servers: "question":"medicalConditions","answer":["pcos"]." This transmission included the user's device ID, distinct ID, name, and internal custom event label, tying the disclosed reproductive health information to a persistent user profile.

57.    Other onboarding answers—such as the user's contraceptive method, menstrual symptoms, date of last period, cycle length, period regularity, cervical mucus changes, specific emotions, sex drive and frequency, and fertility goals, perimenopause symptoms, use of hormone therapy, dates when users are fertile/not fertile, *inter alia*—were transmitted in the same manner.

58.    Defendants intentionally designed the onboarding process so that the substantive content of users' disclosures (including medical conditions, fertility goals, side effect history, and birth control usage), along with users' names or persistent identifiers, were sent to Mixpanel before a user created an account or purchased a subscription.

59.    These transmissions occur regardless of the browser (Chrome or Safari) and device

-14-

(laptop, mobile device) and persist even when users rejected non-essential cookies in Natural Cycles' cookie consent banner, as described herein in section G, below.

60.    After the user subscribed, Natural Cycles continued transmitting reproductive health data through Mixpanel's embedded tracking code (Software Development Kit) integrated into its mobile application.  Every in-app interaction—including entering menstrual symptoms, updating menstrual cycle data, recording sexual activity, viewing fertility status messages or opening webpages—triggered real-time transmission of event data to Mixpanel's servers.

61.    These events are transmitted directly to Mixpanel at the moment the interaction occurs.  Each transmission includes not only the user's reproductive health or sexual behavior data, but also unique and persistent identifiers, such as the Mixpanel $device_id, the $distinct_id, other user and account identifiers, device and hardware IDs, browsing and device characteristics, and location information—allowing Mixpanel to associate a user's most intimate reproductive and bodily data with a specific individual and device.  Mixpanel also received the user's full name and email address.

62.    On information and belief, when users, including Plaintiffs and Class Members, tracked menstrual dates, ovulation and pregnancy test results, emergency contraception use, pregnancy test outcomes, sleep patterns, moods and emotions, libido changes, physical symptoms, pain indicators, bleeding flow, cervical mucus consistency, skin or hormone-related changes, sexual activity (protected sex, unprotected sex, masturbation, oral sex, use of sexual devices, anal sex), ongoing emotional and physical updates (stress levels, mood fluctuations, including irritability, anxiety, calmness, sadness, confidence, and menstrual symptoms), pain (including cramps, back pain, ovulation pain, breast soreness, and headaches), libido changes, sleep patterns, bleeding characteristics (spotting, light, medium, or heavy flow), cervical mucus observations, energy and fatigue, and other hormonally driven cycle changes, this information was transmitted in real time to Mixpanel.

63.    Mixpanel also received event data reflecting users viewed or received reproductive health communications in the app, such as articles, in-app messages, or fertility status notifications

(e.g., "fertility-notFertile,") revealing a user's specific daily reproductive status.

64.     In effect, Natural Cycles engineered nearly every website and app interaction to automatically trigger an instantaneous transmission of reproductive health data to Mixpanel, creating a continuous, moment-by-moment record of a user's menstrual cycle, fertility status, symptoms, sexual activity, and hormonal changes, each tied to identifiable user accounts.

65.     Natural Cycles also transmitted advertising and marketing identifiers to Mixpanel—including campaign_id, campaign_type, campaign_name, utm_source (a standard marketing tracking parameter widely used by Google, Meta, and other ad platforms), fbcIncluded, (a Meta ad-tracking flag), FBServiceTrackWeb, and ttclidIncluded (an event containing a TikTok advertising tracking flag)[28]—none of which are necessary for reproductive health services.  The presence of these advertising identifiers demonstrates that the data collection and disclosures served advertising, marketing, and commercial purposes unrelated to Natural Cycles's fertility or contraception services.

66.     Figure 4, below, is a screenshot from a product demonstration video published by Mixpanel.[29]  The screenshot displays a "user profile that represents an actual user in [the Mixpanel] app."[30]  It shows that a "Distinct ID" is associated with name, email address, location, age, device, and event history.  Mixpanel instructs users to use the same Distinct ID for both events and user profile for the same user: "[u]ser profiles are joined onto your events based on their Distinct ID (Mixpanel's identifier for a user).  This lets you join the events performed by a user with properties describing them."[31]

---

[28]     "TikTok Click ID (TTCLID) is a tracking parameter appended to a landing page URL when you click on an ad on TikTok, helping TikTok to improve ad attribution and performance by associating your Click ID with a campaign." *About TikTok Click ID*, https://ads.tiktok.com/help/article/tiktok-click-id?
[29]     What is Mixpanel: Product Demo, https://www.youtube.com/watch?v=PbKnQ777vuk
[30]     *Id.*
[31]     *Id.*



**Figure 4: Mixpanel Dashboard**

67.    Mixpanel's "Users" dashboard, shown below in Figure 5, aggregates user profiles allowing companies such as Natural Cycles to view full behavioral history, update attributes, and create micro-segments. [32]  The dashboard identifies unique users by name, email address, Distinct ID, traits, and event data.[33]

**Figure 5: Mixpanel Users Dashboard**

68.    Mixpanel also enables clients to group users into "cohorts," defined as "groups of

---

[32]      https://docs.mixpanel.com/docs/data-structure/user-profiles
[33]      *Id.*

users that share a certain set of properties or who perform a similar sequence of events."[34] These cohorts consist of identifiable individuals as they are constructed from user profiles containing names, email addresses, phone numbers, and other identifiers.[35]

69.    Mixpanel enables clients to build identifiable "cohorts" of users who share certain attributes or event patterns and to export those cohorts to Google Ads[36] and Meta (Facebook)[37] for targeted advertising.  These integrations match users primarily by email address or, alternatively, by phone number, name, or device advertising ID.[38] Mixpanel sends Google Ads and Meta the first name, last name, phone number, advertising ID, and distinct ID of the user, when available.[39]

70.    On information and belief, Natural Cycles used Mixpanel's profiling and cohort-export capabilities to market, retarget, and advertise to Natural Cycles users and prospective customers, including Plaintiffs and Class Members.

**2)  AddShoppers, Inc.'s Hidden Tracking Code**

71.    AddShoppers, Inc., doing business as SafeOpt, is a third-party behavioral retargeting and identity resolution platform that operates an email retargeting co-op built on third party tracking cookies and a database of over 175 million U.S. shoppers.[40]

72.    AddShoppers' business model involves surreptitiously collecting and pooling sensitive personal information provided by individuals to online retailers, creating dossiers on those individuals, and tracking them across the internet for AddShoppers' own financial benefit and that of its brand-partner clients.

73.    The purpose of AddShoppers' tracking code is to tie browsing activity on one site with personal information disclosed on another site, obviating the need for the retailers to do it themselves.  Ordinarily, if someone just browses a website without submitting an email address or

---

[34] https://docs.mixpanel.com/docs/users/cohorts#saving-and-sharing-cohorts
[35] *Id.*
[36] https://docs.mixpanel.com/docs/cohort-sync/integrations/google-ads
[37] https://docs.mixpanel.com/docs/cohort-sync/integrations/facebook-ads
[38] *See* notes 33 and 35, *supra*.
[39] https://docs.mixpanel.com/docs/cohort-sync/integrations/google-ads
[40] https://www.addshoppers.com/safeopt;
http://web.archive.org/web/20230425081124/https://calendly.com/d/cft-zy7-gz2/safeopt-intro?month=2023-04.

some other identifying information, the website operator won't be able to email that person.  By contracting with AddShoppers, a website operator can email users discount offers linked to specific products they viewed—even when the user never provided an email address to that site.

74.     Natural Cycles embedded hidden tracking code from AddShoppers on Natural Cycles' website, including within the onboarding flow. This tracking code—a Javascript "pixel" or "widget"— automatically loads and executes in the background, collecting data when users visit Natural Cycles' pages.

75.     The AddShoppers tracking pixel transmitted data in real time directly to AddShoppers' SafeOpt domain ("shop.pe"), including:

- Full URLs of onboarding pages visited (including URLs revealing sensitive reproductive health information);

- Referrer URLs showing the prior page;

- Browser type and version;

- Operating system and device characteristics;

- IP address;

- Timestamp of the visit; and

- Cookie identifiers and unique tracking codes.

76.     In response, AddShoppers' servers set third-party tracking cookies on users' browsers and returned JavaScript code instructing the browser to store persistent identifiers. These cookies remain hidden and automatically transmit information to shop.pe without user knowledge or interaction.

77.     Third-party cookies are stored and executed by domains other than the one the user intentionally visited and can track users across multiple unrelated sites.

78.     These transmissions occur regardless of the browser (Chrome or Safari) or device (laptop, mobile device) and even when the user has rejected non-essential cookies through Natural Cycles' cookie consent banner, as described herein in section G, below.

79.     AddShoppers uses this cross-site tracking to identify users across its network of participating websites and to deliver targeted emails and advertisements based on a combination of browsing activity and personal information obtained from other retailers.

80.     On information and belief, during the relevant period, Natural Cycles participated in AddShoppers' "Data Co-op," which required member companies to grant AddShoppers "a limited, non-transferable…license to their User Data for the purpose of providing identity resolution and direct messaging services for each Data Co-op member's audience."[41]

81.     Through the Data Co-op, AddShoppers pools customer data collected across all participating websites. When a user who previously interacted with any Data Co-op member website subsequently visits Natural Cycles' site, AddShoppers' cookie "syncs" the unique identifier, allowing AddShoppers to link the user's Natural Cycles browsing activity (including health-related URLs) with personal information the user previously provided to other retailers in the Data Co-op network.

82.     Similarly, when a user who browsed Natural Cycles' website subsequently visits another website in the AddShoppers network, the AddShoppers tracking cookie syncs again, transmitting detailed reproductive health related referrer URLs that reveal not only that the user came from Natural Cycles but also which specific pages they viewed.

83.     AddShoppers uses the transmitted data to identify users by matching browser fingerprints and cookie identifiers against its database of over 175 million verified email addresses.

84.     When AddShoppers successfully resolves a user's identity, it assigns the browsing session under that known email profile, even though the user never submitted an email address to Natural Cycles.  AddShoppers then links the user's Natural Cycles browsing, including sensitive reproductive health related URLs to that email address and the user's broader dossier.

85.     This tracking scheme serves three commercial purposes: (i) it enables Natural Cycles to send retargeted emails to users who never provided an email address; (ii) it enables

---

[41]     Master Subscription Agreement, https://www.addshoppers.com/msa.

AddShoppers' approximately 1,000 brand partners[42] to send targeted advertisements to Natural Cycles users based on their health information; and (iii) it allows AddShoppers to monetize aggregated browsing data by building comprehensive user profiles spanning multiple retailers and years of browsing history.

86.    AddShoppers derives financial benefit by charging fees to Natural Cycles and other brand partners for email remarketing and behavioral advertising services, all based on data collected without Plaintiffs' and Class Members' knowledge or consent.

87.    AddShoppers thus intercepts, collects, and monetizes users' electronic communications with Natural Cycles for AddShoppers' own commercial gain and that of its other clients.

### 3) <u>Google's Hidden Tracking Code</u>

88.    Alphabet Inc., Google's parent company, ("Google") is an advertising company headquartered in California that has "built world-class advertising technologies for advertisers, agencies, and publishers to power their digital marketing businesses."[43] Google generates revenue by "serving the right ads at the right time."[44]

89.    Google generates revenues primarily by "delivering both performance and brand advertising."[45]  In 2024, advertising, largely run through Google, accounted for around 75% of Alphabet Inc.'s total revenue.

90.    Defendants embedded tracking code from Google technologies, Google Analytics and Google Tag Manager, in Natural Cycles' website and onboarding webpages at www.naturalcycles.com and signup.naturalcycles.com.

91.    Google Tag Manager is a tag management tool that can be configured to trigger

---

[42]    http://web.archive.org/web/20230425081124/https://calendly.com/d/cft-zy7-gz2/safeopt-intro?month=2023-04.

[43]    Alphabet    Inc.    SEC    Form 10-K    for    fiscal year    ended December 31, 2024, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204425000014/goog-20241231.htm

[44]    *Id.*

[45]    *Id.*

1    tracking tags in response to certain events.

2        92.    Google Analytics is a platform that collects data from websites and apps to create

3    reports and provide insights. As Google describes it: "Every time a user visits a webpage, the

4    tracking code will collect pseudonymous information about how that user interacted with the

5    page."[46]

6        93.    Natural Cycles configured Google Analytics to track users throughout the

7    onboarding process, transmitting data about each page view, interaction, and step in the

8    reproductive health questionnaire.

9        94.    The Natural Cycles onboarding questionnaire flow triggers Google Analytics POST

10   requests to Google-controlled domains, including analytics.google.com. These requests transmit

11   user and/or device identifiers, referrer information, browser characteristics, and complete URL

12   paths corresponding to the user's reproductive health onboarding steps.  Specifically, when Google

13   Analytics is deployed, the Natural Cycles website transmits the following data to Google servers:

- Complete URLs of every page visited by the user, including URLs containing sensitive health-related information in the path segments
- Page titles, such as "Natural Cycles: Natural Birth Control | No Hormones or Side Effects"
- Referrer information indicating the user's navigation path through reproductive health content
- Device and browser metadata, including operating system, browser type and version, screen resolution, user agent string, and language preference.

19       95.    These transmissions occur before a user creates an account or pays for a subscription

20   and include file paths and page titles that directly reveal sensitive reproductive health content the

21   user is interacting with on the site.

22       96.    In addition to user and/or device identifiers, Google received the user's IP address

23   through the standard HTTP protocol used to transmit data from Natural Cycles' webpages to

24   Google's servers. IP addresses reveal geographic location down to city or neighborhood level and

25   can be used to identify individual users, particularly when combined with other data points.

26       97.    The combination of IP address, device identifiers, Google account cookies, browser

27   _____

28   [46]    How Google Analytics works., https://support.google.com/analytics/answer/12159447

fingerprinting, and behavioral data enabled Google to create highly accurate user profiles linking specific individuals to their sensitive reproductive health interests expressed on Natural Cycles' website.

98.    Google receives persistent identifiers that enable it to track individual users across sessions, devices, and websites. These identifiers include (a) the Google Analytics Client ID (e.g., "cid=[ ]"), a unique identifier assigned to each user that persists across multiple sessions, and (b) first-party cookies such as _ga and _ga_# cookies containing device identifiers that track the user across the Natural Cycles domain.

99.    Google uses both first-party and third-party cookies to track users on and across different websites. These cookies store both account and device identifiers, enabling Google to link activity on Natural Cycles' website to a user's broader web browsing behavior and Google account.

100.    For users logged into a Google account (Gmail, YouTube, Google Search, etc.), Google can directly associate the reproductive health information transmitted from Natural Cycles' website with the user's real identity, email address, and comprehensive behavioral profile maintained across Google's ecosystem of services.

101.    Even for users not logged into Google, Google can link the reproductive health data to a persistent device identifier and IP address, creating a pseudonymous profile that becomes identifiable when the user later logs into any Google service or when combined with other data sources.

102.    Google's tracking technologies support cross-device tracking, meaning that Google can associate a user's reproductive health browsing on Natural Cycles across multiple devices (e.g., mobile phone, laptop, tablet) belonging to the same individual.

103.    Natural Cycles allowed Google, a third-party behavioral advertising company, to receive page metadata sufficient to associate individual users with sensitive reproductive health interests. Google can link this metadata to larger behavioral profiles and advertising IDs, boosting its ad targeting accuracy and monetizing sensitive health engagement patterns.

104.    Google Analytics creates "audiences" i.e., groups of users who share similar

behavioral or demographic data. As Google describes it: "In Google Analytics, an audience is a group of users from your site and/or app who have generated similar behavioral data or who share demographic or other descriptive data…"[47]

105.    Google uses this audience data for "remarketing," which "lets you re-engage users based on their behavior in your app or on your site. When users fit the behavioral profile for an audience... they are added to that audience and are eligible to see ads related to that earlier behavior."[48]

106.    Upon information and belief, Google accessed Plaintiffs and Class Members' reproductive health information transmitted from Natural Cycles, then used the information for its own commercial purposes, including improving Google's advertising and analytics service offerings; generating revenue by creating targetable audience segments; measuring the effectiveness of advertising campaigns; personalizing content and ads that users see on Google's and its partners' sites and applications; and building comprehensive user profiles that include reproductive health interests and behaviors.

107.    By transmitting page URLs, titles, referrer paths, and user identifiers to Google Analytics, Natural Cycles enabled Google to identify which specific individuals, including Plaintiffs and Class Members, were interested in fertility tracking, pregnancy prevention, hormonal contraception alternatives, and related reproductive health topics, all without users' knowledge or meaningful consent.  Google was also able to identify which specific individuals progressed through a fertility goal onboarding flow, or another flow in the questionnaire based on the user's reproductive health status, and thereby infer the user's reproductive health status and their plans to conceive or to prevent pregnancy.

108.    This data is particularly valuable to Google because reproductive health data represents a lucrative advertising category with high commercial intent, as users researching

---

[47]    Introduction to audiences in Google Analytics, https://support.google.com/analytics/answer/12799087
[48]    Enable remarketing with Google Analytics data, https://support.google.com/analytics/answer/9313634

contraception, fertility, and pregnancy related products are often in the market for related goods and services.

### 4)  TikTok's Hidden Tracking Code

109.    TikTok is a social media platform and advertising technology company owned by ByteDance Ltd. The TikTok platform is used to create and share videos, and it utilizes tracking technologies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[49]

110.    TikTok's primary source of revenue is digital advertising. TikTok generates billions of dollars annually by collecting detailed user data and selling targeted advertising based on that data.[50]

111.    To facilitate its advertising business, TikTok provides tracking technology known as the "TikTok Pixel" to third-party websites, including Defendants.[51] The TikTok Pixel is a JavaScript code snippet embedded in websites that transmits user data from those websites directly to TikTok's servers located at analytics.tiktok.com.

112.    TikTok uses the data collected through its tracking pixel to: (a) build detailed profiles of individual users' interests, behaviors, and characteristics; (b) target advertisements to those users on TikTok's platform and partner websites; (c) create "lookalike audiences" of users with similar characteristics; and (d) measure advertising effectiveness and conversion rates. [52]

113.    TikTok monetizes this data by charging advertisers premium rates to reach users based on their demographics, interests, behaviors, and other personal characteristics derived from tracking pixel data.

114.    Natural Cycles embedded TikTok's tracking pixel on its website, including on pages

---

[49]    *See, e.g.,* TikTok for Business, https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel,  https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?).
[50]    Business of Apps, TikTok Revenue and Usage Statistics (2025), https://www.businessofapps.com/data/tik-tok-statistics/
[51]    About TikTok Pixel, https://ads.tiktok.com/help/article/tiktok-pixel?
[52]    https://ads.tiktok.com/help/article/tiktok-pixel; https://ads.tiktok.com/help/article/lookalike-audience

where users provide sensitive reproductive health information during account registration and onboarding.

115.    Through this pixel, Natural Cycles automatically transmitted to TikTok, without users' knowledge or consent, detailed information about each user's activity on Natural Cycles' website, including but not limited to:

- Complete URLs of every page visited by the user, including URLs containing sensitive health-related information in the path segments;

- Referrer URLs showing the complete navigation path and sequence through sensitive health-related pages;

- Precise timestamps indicating exactly when users visited each page and how long they spent reviewing sensitive reproductive health information;

- Session identifiers linking all page visits together into a comprehensive browsing session, allowing TikTok to reconstruct users' complete journey through Natural Cycles' onboarding process;

- Device and browser information, including complete user agent strings, screen resolution, device platform, and browser architecture details;

- Page load progress indicators showing the user's engagement level with each page;

- Persistent tracking cookies including the "_ttp" cookie stored on users' devices for 365 days, enabling TikTok to track users across multiple sessions and websites over an extended period; and

- Event types such as "Pageview" and "ViewContent" events, categorizing user interactions for TikTok's advertising optimization algorithms.

116.    Each data transmission from Natural Cycles to TikTok was sent via HTTP POST request to https://analytics.tiktok.com/api/v2/pixel, allowing TikTok's systems to simultaneously view, read, and store the data.

117.    The data transmitted by Natural Cycles to TikTok constitutes highly sensitive reproductive and sexual health information that reveals intimate details about Plaintiffs and Class Members' private medical conditions, health status, and personal reproductive decisions.

118.    From the URLs and navigation patterns transmitted to TikTok, TikTok can infer sensitive health information about each user.

119.    The sequential nature of the transmitted URLs, captured through referrer data and timestamps, allows TikTok to reconstruct the pregnancy and fertility goals and choices of the user, and know, at a minimum, whether they are trying to conceive, trying to avoid pregnancy, pregnant, postpartum, or perimenopausal.

120.    TikTok employs multiple methods to create persistent unique identifiers for individual devices and browsers, enabling long-term tracking of users' Natural Cycles activity. Through these identifiers, combined with re-identification techniques, cross-platform linking, and commercially available data, TikTok can link users' sensitive reproductive health data from Natural Cycles to their broader online activity, TikTok accounts, and real-world identities.

121.    TikTok assigns each device and browser multiple persistent unique identifiers including:

- **Cookie-Based Identifiers:** These allow TikTok to recognize and track the same device/browser over time;

- **Session Identifiers**: Each browsing session is assigned a unique session identifier that links all page visits within that session, enabling TikTok to reconstruct complete user journeys through Natural Cycles' website; and

- **Pageview Identifiers**: Each individual page view is assigned a unique identifier that chains together session data, device fingerprints, and the TikTok pixel code.

122.    TikTok utilizes cookies and tracking technologies to collect data from websites that have integrated TikTok's tracking technologies. The "ttp" cookie is used to measure and improve the performance of a company's advertising campaigns and to personalize the user's experience (including ads) on TikTok.[53]

123.    Even without directly collecting email addresses, phone numbers, or names in a given session, TikTok can identify individual users through re-identification techniques that combine the persistent device identifiers, IP addresses, device fingerprints, and behavioral patterns it collects with commercially available data.

124.    Academic research has demonstrated that seemingly anonymous data with sufficient data points can re-identify individuals. One example is if "the device becomes uniquely identifiable

---

[53]    https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en

to a user via fingerprinting, which is a method that combines several different attributes of a device (e.g., screen resolution, IP address, operating system, device ID) to identify the unique device… the probability of two different devices having the exact same combination of these attributes is statistically low, which thus makes it possible to identify a device."[54]

125.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. . . TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences." [55]

126.    The combination of persistent tracking, re-identification capabilities, and linkage opportunities enables TikTok to build detailed, individualized reproductive health profiles tied to real persons for commercial profit through targeted advertising.

### 5)  <u>Third Parties Received "Reproductive and Sexual Health Application Information" Under CMIA</u>

127.    California Civil Code § 56.05(q) defines "reproductive or sexual health application information" as "information about a consumer's reproductive health, menstrual cycle, fertility, pregnancy, pregnancy outcome, plans to conceive, or type of sexual activity collected by a reproductive or sexual health digital service, including, but not limited to, information from which one can infer someone's pregnancy status, menstrual cycle, fertility, hormone levels, birth control use, sexual activity, or gender identity."

128.    As described above, Mixpanel received personally identifiable information tied to the users' answers to the onboarding questionnaire as well as in-app menstrual tracking events.

---

[54]    Privacy International, *Nobody's Business but Mine*: Vol. 2 (May 2025), https://privacyinternational.org/report/5573/download-no-bodys-business-mine-vol-2
[55]    TikTok for Business: How to set up Automatic Advanced Matching, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching.

These transmissions constitute "reproductive and sexual health application information" under California Civil Code § 56.05(q) because they directly reveal, or enable third parties to infer, users' reproductive health status, pregnancy status, family planning intentions, and intimate health decisions.

129.    Natural Cycles also disclosed the full onboarding URLs and associated referrer information, which reveals the user's navigation path, to Mixpanel, AddShoppers, Google, TikTok and other third parties.  These URL strings also constitute "reproductive and sexual health application information" under California Civil Code § 56.05(q).

130.    Natural Cycles operates in distinct reproductive health modes each tailored to the user's fertility goal and reproductive health status.

131.    At the beginning of the onboarding questionnaire, at https://signup.naturalcycles.com/en-US/onboarding/fertility-goal, users select the fertility mode corresponding to their reproductive health status, (e.g., "prevent pregnancy," "prevent now, plan later," "get pregnant faster," "decode perimenopause," "track my pregnancy," "recover from childbirth," "track my cycle"):

132.    The selected fertility goal triggers a distinct onboarding flow, consisting of goal-specific questions and corresponding URLs.  The sequence of these URLs, combined with referrer headers revealing the prior page visited, directly and/or inferentially reveal a user's fertility goal and/or reproductive health status.

133.    The URL paths and referrer data transmitted to third parties reveal the user's precise reproductive life stage including whether the user is  (i) planning pregnancy; (ii) preventing pregnancy; (iii) currently pregnant; (iv) currently postpartum; or (v) currently experiencing perimenopause.

134.    *Plans to conceive*.  Defendants transmitted numerous URLs to third parties, including but not limited to:
https://signup.naturalcycles.com/en-US/onboarding/fertility-goal-info
https://signup.naturalcycles.com/en-US/onboarding/planned-pregnancy
https://signup.naturalcycles.com/en-US/onboarding/learn-about-sex
https://signup.naturalcycles.com/en-US/onboarding/best-time-in-cycle

https://signup.naturalcycles.com/en-US/onboarding/knowing-your-sex-drive
https://signup.naturalcycles.com/en-US/onboarding/sex-drive-info
https://signup.naturalcycles.com/en-US/onboarding/sex-frequency
https://signup.naturalcycles.com/en-US/onboarding/know-pregnant-days
https://signup.naturalcycles.com/en-US/onboarding/menstrual-cycle-info
https://signup.naturalcycles.com/en-US/onboarding/testimonial-info
https://signup.naturalcycles.com/en-US/onboarding/hormonal-birth-control-usage
https://signup.naturalcycles.com/en-US/onboarding/planned-pregnancy-info
https://signup.naturalcycles.com/en-US/onboarding/cycle-length
https://signup.naturalcycles.com/en-US/onboarding/period-regularity
https://signup.naturalcycles.com/en-US/onboarding/period-regularity-info
https://signup.naturalcycles.com/en-US/onboarding/cycle-start-date
https://signup.naturalcycles.com/en-US/onboarding/medical-conditions-plan

135.    These path segments themselves disclose that the user is actively seeking to conceive, e.g., "fertility-goal," "planned-pregnancy," "best-time-in-cycle", "know-pregnant-days," "period-regularity." That a user is answering questions about optimal conception timing reveals an intent to become pregnant.  The "medical-conditions-plan" suffix appears only when a user has selected the pregnancy planning mode.  Third parties receiving these URLs can infer "plans to conceive," which is protected reproductive health information under § 56.05(q).

136.    *Preventing pregnancy.*  For users selecting the contraception mode, some URL paths contain a "prevent" suffix.  For example:

"url": https://signup.naturalcycles.com/en-US/onboarding/medical-conditions-prevent

"referrer": https://signup.naturalcycles.com/en-US/onboarding/period-regularity-info

The referrer header reveals that the user is answering menstrual cycle regularity questions and the "prevent" suffix reveals that the user is seeking to prevent pregnancy.  Another prevent mode URL is https://signup.naturalcycles.com/en-US/onboarding/birth-control-method.  Third parties receiving these transmissions can infer that the user is seeking to use Natural Cycles as a medical device for contraception, which is protected information under § 56.05(q)'s explicit inclusion of "birth control use."

137.    *Current pregnancy.*  Defendants also transmitted URLs reflecting active pregnancy tracking, including https://signup.naturalcycles.com/en-US/onboarding/follow-pregnancy-info.  The "follow-pregnancy" path appears only when a user selects "Track my pregnancy" during onboarding.  Third parties receiving this URL can infer the user's current pregnancy status, which is

1    protected information under § 56.05(q).

2        138.    *Perimenopause Status.*  Defendants transmitted perimenopause specific URLs to

3    third parties, including:

4        https://signup.naturalcycles.com/en-US/onboarding/pmp-needed-support
        https://signup.naturalcycles.com/en-US/onboarding/pmp-body-changes-info

5        https://signup.naturalcycles.com/en-US/onboarding/pmp-hormonal-shifts-info
        https://signup.naturalcycles.com/en-US/onboarding/pmp-physical-symptoms

6        https://signup.naturalcycles.com/en-US/onboarding/pmp-emotional-symptoms
        https://signup.naturalcycles.com/en-US/onboarding/pmp-symptom-duration

7        https://signup.naturalcycles.com/en-US/onboarding/pmp-managing-symptoms
        https://signup.naturalcycles.com/en-US/onboarding/pmp-daily-checkin-info

8        https://signup.naturalcycles.com/en-US/onboarding/pmp-hcp-discussion

9        https://signup.naturalcycles.com/en-US/onboarding/pmp-lifestyle-factors
        https://signup.naturalcycles.com/en-US/onboarding/pmp-what-to-track

10

11   These URLs reveal that the user is experiencing perimenopause and seeks to track associated

12   symptoms.  The pages reference the user's "perimenopause journey," which third parties can infer

13   hormone related changes associated with perimenopause, perimenopause symptoms, and potential

14   interest in hormone therapy—information falling within § 56.05(q)'s protection for "hormone

15   levels" and "reproductive health" status.

16       139.    In sum, in the context of a fertility and digital contraception application, a user

17   answering questions about optimal conception timing reveals active plans to conceive. A user

18   answering questions about birth control and contraception methods reveals the user is seeking to

19   prevent pregnancy.  A user responding to pregnancy tracking questions reveals they are currently

20   pregnant.  A user navigating through perimenopause-specific questions reveals they are

21   experiencing perimenopause.  Each of these inferences constitute protected reproductive or sexual

22   health application information under § 56.05(q).

23       140.    Upon information and belief, third parties including Google, AddShoppers, and

24   TikTok used this sensitive reproductive and sexual health data for commercial advertising purposes,

25   including (i) to create audience segments based on reproductive health status (e.g., "users

26   researching birth control," "users with fertility concerns," "hormonal contraception users," "users

27   experiencing perimenopause"); (ii) target advertisements for fertility treatments, contraceptive

28

products, health services, hormone therapy, perimenopause supplements, and related products based on inferred health conditions; (iii) build comprehensive user profiles incorporating reproductive health data with other behavioral and demographic data; and/or (iv) sell or provide access to these audience segments and profiles to third-party advertisers and data brokers.

### C.    The Economic Value of Reproductive Health Data

141.    Reproductive health data—particularly menstruation and pregnancy data—occupies a unique position in the data economy. As researchers have documented, menstrual tracking app data is a "gold mine" for advertisers.[56]  Unlike ordinary consumer information, pregnancy and fertility data command extraordinary premiums in the advertising marketplace, creating powerful economic incentives for companies to monetize users' most intimate bodily information.

142.    Pregnancy data is worth fifteen times more than average consumer data: while typical consumer information is valued at approximately $0.10 per person, information about a pregnant consumer is worth $1.50 to advertisers.[57]  This valuation differential exists because pregnancy represents a transformational life event that fundamentally alters shopping behavior, brand loyalty, and purchasing decisions for years—making pregnant consumers among the most valuable targets in the entire advertising ecosystem.

143.    The cycle tracking app market is predicted to reach $7.52 billion by 2032.[58]

---

[56]    *Menstrual tracking app data is a 'gold mine' for advertisers that risks women's safety – report*, University of Cambridge Minderoo Centre for Technology and Democracy (June 11, 2025), https://www.cam.ac.uk/research/news/menstrual-tracking-app-data-is-a-gold-mine-for-advertisers-that-risks-womens-safety-report.

[57]    Stefanie Felsberger, *Data Flows & Menstruation: How Users of Period Trackers Navigate the Datafication & Commodification of their Menstrual Cycles*, Darwin College (Dec. 2023), at 18 (citing research conducted by *Janet Vertesi* in 2014).

[58]    Menstrual Health Apps Market Expected to Reach USD 7.52 Billion by 2032, Driven by Smartphone Adoption & Personalized Digital Health Solutions – SNS Insider, https://finance.yahoo.com/news/menstrual-health-apps-market-expected-100400856.html

1

**D.    Natural Cycles Falsely Informs Consumers They Can Reject or Block Non-Essential Browser Cookies**

2

144.    Before the user begins the onboarding questionnaire on the Natural Cycles website,

3

they are presented with a cookie consent pop-up.  As depicted below in Figure 6, below, the cookie

4

consent pop-up states: "We use cookies to analyze traffic for the personalization of content and

5

ads…"

6

7

8

9

10

11

12

13

14

15



16

***Figure 6: Screenshots of Cookie Consent Pop-up on Natural Cycles Webpage***

17

145.    Natural Natural Cycles presents users with a cookie banner offering two options:

18

"Manage cookies" or "Allow all cookies." If a user selects "Manage cookies," they are shown a

19

settings panel where they may individually enable or disable categories of non-essential cookies,

20

including preferences, statistics, and marketing cookies. As displayed in Figure 7, these non-

21

essential categories appear toggled off by default. To confirm any selections—whether opting out

22

or permitting specific cookies—the user must click "Save settings."

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11



*Figure 7: Screenshot of "Adjust cookie settings" in*
*Cookie Consent Pop-up on Natural Cycles Webpage*

146.    The user can, but is not required to, click on an arrow button situated alongside the preferences, statistics, and marketing cookies to learn more.  Natural Cycles described the purpose of each category of non-essential cookies as follows:

- **Preferences**: These cookies enable the sites, services, and Webshop, to provide enhanced functionality and personalization.  They may be managed by Natural Cycles or by third party providers whose services we have added to our sites, services and Webshop.

- **Statistics**: These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our sites, services and Webshop.  They let us know which pages are the most and least popular and see how visitors move around the sites and Webshop.  All information that these cookies collect is aggregated and therefore anonymous.

- **Marketing Cookies**: Marketing cookies are used to track visitors across websites.  The intention is to display ads that are relevant and engaging for the individual user.

1
2
3
4
5
6
7
8
9
10



11
12

**Figure 8: Screenshot of Description of Non-Essential Cookies in
"Adjust cookie settings" in Cookie Consent Pop-up on Natural Cycles Webpage**

13       147.     The cookie banner expressly offers users the ability to "reject" or "decline" non-
14   essential cookies.  A reasonable user would understand this to mean that analytics and marketing
15   tracking will be disabled.  Natural Cycles reinforces this belief by displaying the cookie consent at
16   the gateway to onboarding, suggesting that later tracking depends on a user's voluntary, informed
17   choice.

18       148.     Yet Natural Cycles continues to deploy third-party tracking technologies during the
19   onboarding process even when users decline non-essential cookies.  Regardless of whether a user
20   accepts or rejects non-essential cookies, Natural Cycles immediately deploys Mixpanel and
21   AddShoppers' tracking technologies prior to onboarding—before users can meaningfully evaluate
22   the privacy implications or review any policy disclosures.

23       **E.     Natural Cycles Did Not Obtain Users' Consent to Disclose Their Individually
24             Identifiable Reproductive Health Data to Third Parties, or To Use It For
               Commercial Benefit**
25
26       149.     Natural Cycles required users to disclose deeply intimate reproductive-health
27   information, including sexual activity, menstrual patterns, fertility goals, medical conditions, and
28   contraceptive history, to use the App.

150.    Natural Cycles assures users that their sensitive health and sex data will not be shared with third parties without explicit consent. On its "How does Natural Cycles protect my data?" page, Natural Cycles asks "Do you share my sensitive data with third parties?" and answers:

> Natural Cycles does not share sensitive data with third parties, with the exception of anonymized data that we share with researchers — and only if users consent to their data being used in such a way.

> If you've consented for us to use your health data for research into women's reproductive health, this data will be shared with organizations such as universities, which help us to conduct scientific research. For our research, we use pseudonymized copies of production data wherever possible. This means that this data cannot be linked back to you as an individual. We anonymize information by either deleting all information that can be connected to you or encrypting it in such a way that it cannot be reversed.[59]

151.    None of Natural Cycles' user-facing materials—FAQs, consent flows, privacy content, onboarding screens, nor the cookie banner—inform users that their personally identifiable information linked to sensitive reproductive health data will be disclosed to Mixpanel and other third-party tracking companies.  Natural Cycles never disclosed their involvement, never requested authorization for third-party analytics processing of medical information, never offered an opt-in mechanism, and never obtained actual consent required to transmit such data.

152.    None of Natural Cycles' disclosures inform users that their individually identifiable reproductive health data will be sent to Mixpanel, AddShoppers, Google, and TikTok, allowing those companies to identify the user and their reproductive health data for marketing and analytics purposes.

153.    Neither the cookie banner nor the privacy policy constitutes valid consent—much less the express authorization required under CMIA. These disclosures fail on multiple grounds. First, they do not disclose that Mixpanel and AddShoppers receive individually identifiable sensitive reproductive, sexual health, and medical information. Second, this nondisclosure persists even when users click "Reject" to cookies—meaning data sharing continues despite an explicit user objection. Third, Defendants do not disclose that Plaintiffs and Class Members' individually

---

[59]    https://help.naturalcycles.com/hc/en-us/articles/360003330234-How-does-Natural-Cycles-protect-my-data.

identifiable reproductive health data is shared with third parties such as Google and TikTok for marketing purposes. To the contrary, Defendants represent that even if a user "consents" to their data being sent to a third party it remains anonymous.  The purported "consent" is therefore legally deficient in every respect.

### F.    Plaintiffs and Class Members Have a Reasonable Expectation of Privacy In Their Reproductive Health Data

154.    Plaintiffs and Class Members have a reasonable expectation of privacy in the intimate details of their reproductive lives, including menstruation data, fertility predictions, ovulation test results, pregnancy status, contraception use, medical conditions, sexual activity, menstrual symptoms, and other bodily markers and biometrics, and reasonably expect that such data will remain private and under their control.

155.    Reproductive health information is among the most sensitive categories of personal data because it reveals core aspects of an individual's body, health status, sexuality, intimate relationships, and fundamental life choices.  These apps function like health care repositories for sensitive bodily information akin to medical records and are used to inform health decisions.[60] Users maintain an expectation of privacy given the intimacy of the data themselves, and their creation for health purposes.[61]  They are shocked and disturbed to learn that their sensitive reproductive health data is shared with third parties and used to target them with advertisements tailored to their menstrual or pregnancy status.[62] They find this practice uniquely invasive and experience it as a profound loss of power to control intimate data about their own bodies:

> Unlike other targeted ads, these capitalize on an especially sensitive class of traditionally privileged health data. The resulting experience of advertisements tailored to one's menstrual or pregnancy status is uniquely invasive. Being sold tampons while a user is bleeding represents an unprecedented loss of privileged consumer self-knowledge and its associated power. The resulting revelation of consumer preferences increases users' vulnerability and helps explain the discomfort users felt when they discovered the details of this process. [63]

---

[60]    Marielle S. Gross, *et. al*., *Pay No Attention to that Man Behind the Curtain: An Ethical Analysis of the Monetization of Menstruation App Data* (Fall 2021), at 149.
[61]    *Id.* at 148.
[62]    *Id.* at 147-148.
[63]    *Id.* at 147-148.

156.    Plaintiffs and Class members reasonably expect that apps like Natural Cycles marketed as reproductive health, contraception, or fertility devices will safeguard, rather than disclose and commercialize, their most intimate information.

157.    Because reproductive-health information can reveal pregnancy status, menstrual irregularities, contraception use, sexual behavior, and related health conditions, individuals have an objectively reasonable expectation that such information will not be shared with third parties without explicit, informed opt-in consent. This expectation is heightened where disclosures can lead to employment discrimination, criminal investigation, stigmatization, or other serious harms.

158.    Natural Cycles markets itself as a subscription-based, privacy-protective alternative to "free" apps that monetize personal data, and encourages consumers to trust the App with their reproductive health data:

> Why should I trust an app?
>
> NC° Birth Control is more than an app. It's a certified medical device that's regulated by official bodies. And while apps can get a bad rep when it comes to data privacy, one of the reasons we charge a subscription fee is to protect our users. We take your data privacy very seriously and will never monetize your data by selling it to third parties.[64]

159.    Reasonable consumers do not expect that an app like Natural Cycles framed as an intimate health companion will disclose their reproductive health or sexual activity information for unrelated commercial purposes.  They "trust these apps with highly sensitive data because they view them as intimate health companions, not data-collection tools," and "do not foresee sharing beyond what is required for essential functionality."[65]

160.    The sensitive nature of reproductive health and sexual behavior information, combined with the App being an FDA-cleared medical device, and Natural Cycles' representations about data privacy and security, reinforces consumers' reasonable expectation that such data will remain confined to the reproductive health app itself, and not used, commercialized, or shared for

---

[64]    https://www.naturalcycles.com/how-effective-is-natural-cycles
[65]    Muhammad Hassan, *et. al.*, *Unveiling Privacy and Security Gaps in Female Health Apps* (February 2024), at 2.

analytics, advertising, profiling, product marketing, or other commercial purposes unrelated to the provision of the reproductive health services.

161.    Fertility apps such as Natural Cycles collect "highly sensitive personal and medical data" such that misuse or exposure of that information can "jeopardize the very autonomy these tools seek to support." [66] After *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), privacy concerns around reproductive health data have intensified, as such data has been sought in legal and investigative contexts, increasing the risk of misuse and exploitation.[67]

162.    As recent as November 8, 2025, Mixpanel was subject to a "security incident" or cyber-attack that allowed unauthorized access to parts of its systems, resulting in export of data containing customer-identifiable and analytics information, including names, email addresses, browser and operating system information, approximate location, and referring websites.[68] This incident underscores that when sensitive reproductive data is shared with third parties—the likelihood of unauthorized use, malicious access, or resale on secondary markets is heightened.

163.    Contrary to consumers' reasonable expectations of privacy, Natural Cycles embedded third-party tracking and analytics technologies—including Mixpanel, AddShoppers, Google, and TikTok—into its app and website, enabling profiling and data sharing for advertising and commercial purposes unrelated to core reproductive health functions.

## V.  PLAINTIFFS' EXPERIENCES

### A.    Plaintiff S.A.

164.    Plaintiff S.A. is an individual residing in Moreno Valley, California who used the Natural Cycles' website and mobile app.  She subscribed to Natural Cyles in or around September 28, 2023 and again in or around January 2025, and used it through approximately March 2025.

165.    Plaintiff interacted with the website (https://signup.naturalcycles.com) and mobile

---

[66]    *Id.*
[67]    *See id.*
[68]    https://mixpanel.com/blog/sms-security-incident/. https://www.businessinsider.com/openai-mixpanel-hackers-stole-data-analytics-partner-chatgpt-2025-11; https://openai.com/index/mixpanel-incident/.

app, including answering questions in the onboarding questionnaire and tracking her menstrual cycle. She provided Natural Cycles with reproductive and sexual health information and other personal health information, including information about her health and wellness, menstruation cycle, and sexual activity, such as name, date of birth, email address, past hormonal birth control use; dates of menstration, menstration flow, menstrual and ovulation symptoms, cycle length, daily basal temperature, dates and type of sexual activity, libido, cervical mucus, emotional state, sleep patterns, and her fertility goals for using the app, including to become pregnant, to later track her postpartum status, and then later to prevent pregnancy.

166.    Plaintiff believed her information would stay private and that Natural Cycles would not disclose this personal reproductive and sexual activity information to third parties.

167.    Plaintiff did not consent or provide permission for Natural Cycles to share or disclose her intimate reproductive health data for the commercial benefit of Natural Cycles or any of its vendors.

168.    At or around the time she first started to interact with the Natural Cycles website and mobile app and provided her reproductive and sexual health information to Natural Cycles, she received specific targeted advertisements for Natural Cycles on social media platforms such as Instagram and Tiktok related to her fertility goals/status, suggesting that her data had been used by Natural Cycles, Meta Platforms Inc. ("Meta"), formerly known as Facebook), and TikTok to create advertising profiles to target her.

169.    In addition to the third parties alleged herein (Mixpanel, AddShoppers, Google, and TikTok) that Natural Cycles shares personal information and intimate reproductive and sexual health information with, on information and belief, Natural Cycles sent Plaintiff's personal information, including their reproductive health data, to Meta's Conversions API, which operates entirely server-to-server and bypasses browser controls, cookie settings, and user consent mechanisms.[69]

---

[69]    About Conversions API, https://www.facebook.com/business/help/2041148702652965?

**B.   Plaintiff S.S.**

170.   Plaintiff S.S. is an individual residing in Los Angeles, California who interacted with the Natural Cycles website.

171.   In or about July 2023, Plaintiff was seeking an alternative to hormonal birth control. Plaintiff browsed the Natural Cycles website and decided to take the Natural Cycles onboarding questionnaire to determine if the Natural Cycles Birth Control was right for her.  She answered questions on Natural Cycles' website (https://signup.naturalcycles.com) and, in the course of doing so, disclosed to Natural Cycles her personally identifying information and her sensitive reproductive and sexual health information, including but not limited to: her name, age, past hormonal birth control use, side effects of past hormonal birth control, and length of use of past hormonal birth control, fertility goal (i.e., to prevent pregnancy), menstruation symptoms, menstruation flow, and identified a suspected condition (polycystic ovary syndrome) affecting menstrual cycles for purposes of determining whether Natural Cycles was appropriate in light of that medical condition. She did not ultimately subscribe to the Natural Cycles service.

172.   Plaintiff believed her information would stay private and that Natural Cycles would not disclose it to third parties.

173.   Plaintiff never authorized, consented to, or provided permission for Natural Cycles to share her personal information and reproductive health and sexual information and other sensitive health and personal information with third parties.

174.   Plaintiff also believed that Natural Cycles honors consumers' choices to reject non-essential cookies.  Before she answered the onboarding questionnaire questions, Plaintiff was presented with a pop-up cookie consent banner offering the ability to reject all non-essential cookies, and to manage preference for performance, analytics and marketing cookies.  Plaintiff's practice, particularly on medical and reproductive health websites, has been to reject all non-essential cookies.

175.   Plaintiff believes she followed the same practice of disabling or rejecting all cookies other than those labeled as "necessary" when she used the Natural Cycles website and mobile

application.  Plaintiff reasonably believed that she opted-out of, rejected and/or declined the placement and use of non-essential cookies and tracking technologies, including those that would disclose her data to third party advertising networks, analytics services, and/or social media companies.

176.    At or around the time she first started to interact with the Natural Cycles website and mobile app and provided her reproductive and sexual health information to Natural Cycles, she received specific targeted advertisements for Natural Cycles on social media platforms such as Instagram and Tiktok related to her fertility goals/status, suggesting that her data had been used by Natural Cycles, Meta and Tiktok to create advertising profiles to target her.

177.    In addition to the third parties alleged herein (Mixpanel, AddShoppers) that Natural Cycles shares personal information and intimate reproductive and sexual health information with, on information and belief, Natural Cycles sent Plaintiff and Class Members' personal information, including their reproductive health data, to Meta's Conversions API, which operates entirely server-to-server and bypasses browser controls, cookie settings, and user consent mechanisms.[70]

### C.    Plaintiff A.S.

178.    Plaintiff A.S. is an individual residing in Oakland, California who interacted with the Natural Cycles website and mobile app.  On or about May 4, 2023, she purchased a paid subscription to Natural Cycle and used the app through approximately February 2024.

179.    Plaintiff interacted with Natural Cycles' website (https://signup.naturalcycles.com) and mobile application, including answering questions in the onboarding questionnaire and tracking her menstrual cycle.  She disclosed to Natural Cycles her personally identifying and sensitive reproductive and sexual health information, including but not limited to: her name, date of birth, email address, past hormonal birth control use, her fertility goals for using the app (to prevent pregnancy and later to plan pregnancy), menstruation cycle length and dates, body temperature, menstruation and ovulation symptoms, menstruation flow, sleep patterns, emotional state, and her luteinizing hormone (LH) and pregnancy test results.

_____

[70]    *Id.*

180.    Plaintiff believed her information would stay private and that Natural Cycles would not disclose it to third parties.

181.    Plaintiff never authorized, consented to, or provided permission for Natural Cycles to share her personal information and reproductive health and sexual information and other sensitive health and personal information with third parties.

182.    Plaintiff also believed that Natural Cycles honors consumers' choices to reject non-essential cookies.  Before she answered the onboarding questionnaire, Plaintiff was presented with a pop-up cookie consent banner offering the ability to reject all non-essential cookies, and to manage preference for performance, analytics and marketing cookies.  Plaintiff's practice, particularly on medical and reproductive health websites, has been to reject all non-essential cookies.

183.    Plaintiff believes she followed the same practice of disabling or rejecting all cookies other than those labeled as "necessary" when she used the Natural Cycles website and mobile application.  Plaintiff reasonably believed that she opted-out of, rejected and/or declined the placement and use of non-essential cookies and tracking technologies, including those that would disclose her data to third party advertising networks, analytics services, and/or social media companies.

184.    At or around the time she first started to interact with the Natural Cycles website and mobile app and provided her reproductive and sexual health information to Natural Cycles, she received specific targeted advertisements for Natural Cycles on social media platforms such as Instagram and Meta, related to her fertility goals/status, suggesting that her data had been used by Natural Cycles and Meta to create advertising profiles to target her.

185.    In addition to the third parties alleged herein (Mixpanel, AddShoppers) that Natural Cycles shares personal information and intimate reproductive and sexual health information, on information and belief, Natural Cycles sent Plaintiff and Class Members' personal information, including their reproductive health data, to Meta's Conversions API, which operates entirely server-to-server and bypasses browser controls, cookie settings, and user consent mechanisms.[71]

---

[71]    *Id.*

### D. **Plaintiff M.F.**

186.    Plaintiff M.F. is an individual residing in Walnut Creek, California who interacted with the Natural Cycles website and mobile application.  On or about January 15, 2024, she purchased a paid subscription to Natural Cycles and has since ceased using the app.

187.    Plaintiff was seeking an alternative to hormonal birth control.  Plaintiff interacted with Natural Cycles' website (https://signup.naturalcycles.com) and mobile application, including answering questions in the onboarding questionnaire and tracking her menstrual cycle.  She disclosed to Natural Cycles her personally identifying and sensitive reproductive and sexual health information, including but not limited to: her name, date of birth, email address, past hormonal birth control use, fertility goal (*i.e.*, to achieve pregnancy), medical conditions affecting menstruation (polycystic ovary syndrome and thyroid disorders), menstruation cycle length and dates, basal body temperature, menstruation and ovulation symptoms, flow characteristics, sleep patterns, and emotional state.

188.    Plaintiff believed her information would stay private and that Natural Cycles would not disclose it to third parties.

189.    Plaintiff never authorized, consented to, or provided permission for Natural Cycles to share her personal information and reproductive health and sexual information and other sensitive health and personal information with third parties.

190.    Plaintiff also believed that Natural Cycles honors consumers' choices to reject non-essential cookies.  Before she answered the onboarding questionnaire, Plaintiff was presented with a pop-up cookie consent banner offering the ability to reject all non-essential cookies, and to manage preference for performance, analytics and marketing cookies.  Plaintiff's practice, particularly on medical and reproductive health websites, has been to reject all non-essential cookies.

191.    Plaintiff believes she followed the same practice of disabling or rejecting all cookies other than those labeled as "necessary" when she used the Natural Cycles website and mobile application.  Plaintiff reasonably believed that she opted-out of, rejected and/or declined the placement and use of non-essential cookies and tracking technologies, including those that would

disclose her data to third party advertising networks, analytics services, and/or social media companies.

192. At or around the time she first started to interact with the Natural Cycles website and mobile app and provided her reproductive and sexual health information to Natural Cycles, she received specific targeted advertisements for Natural Cycles on social media platforms such as Instagram and Meta related to her fertility goals/status, suggesting that her data had been used by Natural Cycles and Meta to create advertising profiles to target her.

193. In addition to the third parties alleged herein (Mixpanel, AddShoppers) that Natural Cycles shares personal information and intimate reproductive and sexual health information, on information and belief, Natural Cycles sent Plaintiff and Class Members' personal information, including their reproductive health data, to Meta's Conversions API, which operates entirely server-to-server and bypasses browser controls, cookie settings, and user consent mechanisms.[72]

## VI.  TOLLING, CONCEALMENT, ESTOPPEL, AND DELAYED DISCOVERY

194. The applicable statutes of limitation have been tolled as a result of Natural Cycles' knowing and active concealment and denial of the material facts alleged herein, namely its practice of disclosing Plaintiffs and Class Members' personally identifying information and intimate reproductive and sexual health data to third parties without user consent or authorization.

195. Natural Cycles intentionally concealed the nature and extent of its actions and intentions.  Natural Cycles also made deliberate efforts to conceal from users that it was sharing intimate reproductive health and sexual information with third-parties by touting its data privacy protections and not honoring its own purported cookie opt-out mechanisms.

196. Plaintiffs learned of this conduct from their counsel shortly before the filing of this complaint.  All applicable statutes of limitation also have been tolled by operation of the delayed discovery rule.  Under the circumstances, Natural Cycles was under a duty to disclose the nature and significance of their data sharing and privacy policies and practices and to obtain users' express

---

[72]    *Id.*

authorization prior to any disclosure of their reproductive information. It did not do so.  Defendants are therefore estopped from relying on any statute of limitations.

197.    Plaintiffs and Class Members could not, with reasonable diligence, have discovered Natural Cycles' conduct earlier, including because it is based on Defendants' use of highly technical proprietary software and there were no disclosures informing a reasonable consumer that Natural Cycles was disclosing individually identifiable, intimate reproductive and sexual health data to third parties.

198.    Plaintiffs lack the technical expertise required to determine whether the Natural Cycles website or mobile app honored their cookie rejection choices or employed hidden tracking technologies, or to identify what network traffic was transmitted to third parties.

199.    Natural Cycles' conduct is common to Plaintiffs and all Class Members.

## VII.    CLASS ACTION ALLEGATIONS

200.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Class:**  All Natural Cycles mobile app users in California who entered menstruation, pregnancy, contraception, perimenopause or other reproductive or sexual health information into the Natural Cycles website and/or mobile app while residing in California during the applicable limitations period through the date of class certification, inclusive (the "Class Period").

> **Subclass:** All individuals in California who entered menstruation, pregnancy, contraception, perimenopause or other reproductive or sexual health information into the Natural Cycles website and/or mobile app after rejecting or blocking non-essential cookies on Natural Cycles' website or mobile app, while residing in California, during the applicable limitations period through the date of class certification, inclusive (the "Subclass Period").

201.    Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3)

Plaintiffs' counsel and Defendants' counsel.

202. **Numerosity**: The exact number of members of the Classes is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Classes likely consist of tens of thousands of users, and the members can be identified through Defendant Natural Cycles's records.

203. **Predominant Common Questions**: The Classes' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the class include, but are not limited to, the following:

    a. Whether Defendants violated Plaintiffs' and Class Members' privacy rights;

    b. Whether Defendants violated California's Constitution, Art. 1, §1;

    c. Whether Defendants violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

    d. Whether Defendant Natural Cycles violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

    e. Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 632;

    f. Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 638.50; and

    g. Whether Defendants were unjustly enriched.

204. **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Class. The claims of Plaintiffs and Class Members arise from the same conduct by Defendant and are based on the same legal theories.

205. **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interests that are antagonistic to the interests of the Class, and Defendant has no defenses unique to any of the Plaintiffs. Plaintiffs and their counsel are committed

to vigorously prosecuting this action on behalf of the members of the Class. Neither Plaintiff nor their counsel have any interest adverse to the interests of the other members of the Class.

206.    **Superiority**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of California Confidentiality of Medical Information Act**
**Civil Code Section, §§ 56 *et seq.***
**(On behalf of Plaintiffs and the Classes)**

207.    Plaintiffs re-allege and incorporate by reference all paragraphs alleged herein.

208.    Natural Cycles is a "provider of health care" under Cal. Civ. Code Section 56.06, subdivision (e), because it offers a "reproductive or sexual health digital service" to consumers for the purpose of allowing the individual to manage the individual's information, or for the diagnosis, treatment, or management of a medical condition of the individual.

209.    "Reproductive or sexual health digital service" means a mobile-based application or internet website that collects reproductive or sexual health application information from a consumer, markets itself as facilitating reproductive or sexual health services to a consumer, and uses the information to facilitate reproductive or sexual health services to a consumer. Cal. Civ. Code 56.05(r).

210.    Section 56.05 defines "Reproductive or sexual health application information" as "information about a consumer's reproductive health, menstrual cycle, fertility, pregnancy, pregnancy outcome, plans to conceive, or type of sexual activity collected by a reproductive or sexual health digital service, including, but not limited to, information from which one can infer someone's pregnancy status, menstrual cycle, fertility, hormone levels, birth control use, sexual

activity, or gender identity." Cal. Civ. Code §56.05 (q).

211.    As alleged in detail above, Natural Cycles collects consumer's reproductive health, menstrual cycle, fertility, pregnancy, pregnancy outcome, plans to conceive, or type of sexual activity, including, information from which one can infer someone's pregnancy status, menstrual cycle, fertility, hormone levels, birth control use, sexual activity, or gender identity.

212.    Natural Cycles is also deemed a "provider of healthcare" under 56.06, subdivision (b), because it "offers software. . . to consumers, including a mobile application or other related device that is designed to maintain medical information in order to make the information available to an individual for purposes of allowing the individual to manage the individual's information." Cal. Civ. Code § 56.05 (b).

213.    The CMIA defines "Medical information" as any "individually identifiable information" that relates to "reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j)(1).

214.    "Medical information" is defined as "individually identifiable" if it contains or includes "any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05(j)(1).

215.    As alleged in detail above, the Natural Cycles website and App, collect and store, in electronic form, users individually identifiable information, in the form of names, email addresses, and specific tracking IDs relating to their reproductive health, such as ovulation and menstrual cycles, their sexual health data, and to treat users seeking to become pregnant or prevent pregnancy, and to manage pregnancy, perimenopause, and menopause. Natural Cycles also collects and stores personal information that it obtains from consumers, including their pregnancy status, fertility, birth control use, and menstrual cycle. Natural Cycles is an FDA-approved medical device that is designed as a birth control and fertility website and application to be used by individuals to manage their information.  This information is "Medical Information" as defined by Cal. Civ. Code Section

56.05(j)(1).

216.    Natural Cycles is therefore subject to the requirements of the CMIA and is obligated under Cal. Civ. Code Section 56.06 subdivision (f) to maintain the same standards of confidentiality required of a provider of health care with respect to Medical Information that it maintains on behalf of users.

217.    Plaintiffs and Class Members are patients under the statutory definition because they "received health care services from a provider of health care" and the information Natural Cycles disclosed to third parties was "medical information pertain[ing]" to them. Cal. Civ. Code § 56.05 (m).

218.    "A provider of health care" is prohibited from disclosing "medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization" unless a statutory exception applies. Cal. Civ. Code § 56.10 (a).

219.    Natural Cycles violated this section of the CMIA when it disclosed Plaintiffs and Class Members' medical information to third-party Mixpanel, AddShoppers, Google, TikTok (and others) without first obtaining Plaintiffs and the Class Members' authorization to do so. Plaintiffs and Class Members did not provide Natural Cycles express authorization, nor was it otherwise authorized to disclose Plaintiffs and Class Members' Medical Information including their pregnancy status, fertility, birth control use, and menstrual cycle to third parties.

220.    Natural Cycles violated Cal. Civil Code Section 56.10 because it did not follow any of the appropriate procedures enumerated in Cal. Civil Code Section 56.11 to obtain proper authorization.

221.    Under the CMIA a "provider of health care ... shall not disclose medical information regarding a patient of the provider of health care ... without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a). "An authorization for the release of medical information ... shall be valid if it:

(1)  Is handwritten or is in a typeface no smaller than 14-point type.

(2) Is clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization.

(3) Is signed ... and dated ...

(4) States the specific uses and limitations on the types of medical information to be disclosed.

(5) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(6) States the name or functions of the persons or entities authorized to receive the medical information.

(7) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(8) States an expiration date or event ....

(9) Advises the person signing the authorization of the right to receive a copy of the authorization." Cal. Civ. Code § 56.11(b).

222.    Natural Cycles was not expressly authorized by Plaintiffs and Class Members to share, sell, use for marketing, or otherwise use medical information for purposes not necessary to provide health care services to them.  By placing third party tracking technologies and embedding them into Natural Cycles' website and app, Defendants intentionally and knowingly shared Plaintiffs and Class Members' medical information with and disclosed that information to third parties Mixpanel, AddShoppers, Google, TikTok (and others) without Plaintiffs and Class Members' knowledge, authorization or consent to use for advertising and analytic purposes.

223.    In violation of Cal. Civ. Code Section 56.10(d), Natural Cycles intentionally shared, sold, used for marketing, and otherwise used the Medical Information of Plaintiffs and Class Members for purposes not necessary to provide health care services to them when it shared information with third parties Mixpanel, Addshoppers Inc., Google, TikTok (and others) by

embedding code from these third parties on its website and mobile application.

224.    Natural Cycle's unauthorized disclosures of Plaintiffs and Class Members' Medical Information has caused injury to them.

225.    In violation of the CMIA, Natural Cycles knowingly and willfully disclosed the Medical Information of Plaintiffs and Class Members without first obtaining "authorization," for its own financial gain.  This release of Plaintiffs and Class Members' Medical Information to MixPanel, AddShoppers Inc., Google, Tik Tok (and others) was an affirmative act in violation of Cal. Civ. Code Section 56.10 (d).

226.    Defendant also violated Cal. Civ. Code § 56.101(a) by failing to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information. Instead, Natural Cycles allowed and enabled third-parties Mixpanel, AddShoppers, Google, TikTok and other unidentified tracking and advertising partners to intercept, duplicate and otherwise infer Plaintiffs and Class Members' private medical information, including pregnancy status, menstrual-cycle data, fertility information, birth-control usage, sexual-health indicators, and other sensitive health-related disclosures. Google, Tik Tok, AddShoppers and other third parties then used this information for their own commercial purposes, including improving, training, and expanding their targeted advertising, analytics, and user profiling systems.

227.    In addition, Cal. Civil Code Section 56.101, subdivision (a), requires that every  provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

228.    Natural Cycles failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to third parties Plaintiffs' and Class Members' intimate medical and health data without consent, including their actual and inferred pregnancy status, fertility, birth control use, and menstrual cycle.

229.    Natural Cycles shared this data with third parties who view and read the data in transit.  Upon information and belief, these third parties also later viewed and used Plaintiffs and

Class Members' information to improve their own software, algorithms, and other business activities to advertise and market its services.

230.    Thus, Natural Cycles shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Cal. Civ. Code Section 56.36.  Under Cal. Civ. Code section 56.36(b)(1), Defendants are liable to Plaintiffs and Class Members for statutory damages of $1,000 per violation, even in the absence of actual damages.

231.    Accordingly, Plaintiffs and Class Members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to Cal. Civ. Code Section 56.35; and (5) reasonable attorneys' fees and other litigation costs reasonably incurred.

**SECOND CLAIM FOR RELIEF**
**Violations of Common Law Invasion of Privacy—Intrusion Upon Seclusion**
**(On behalf of Plaintiffs and the Classes)**

232.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

233.    To state a claim for intrusion upon seclusion, a plaintiff must allege intrusion into a private place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy in a manner highly offensive to a reasonable person.

234.    Natural Cycles' disclosure of Plaintiffs' and Class Members' intimate health data, including information regarding their reproductive health data, including their pregnancy status, menstrual-cycle data, fertility information, birth-control usage, and sexual-health indicators constitutes an intentional intrusion upon Plaintiffs' and Class Members' solitude or seclusion in that Natural Cycles shared these intimate personal details that were intended to stay private with third parties without users' consent, and despite its express promises that it would not do so.

235.    Plaintiffs and Class Members had a reasonable expectation of privacy in their intimate health data. Plaintiffs and Class Members did not consent to, authorize, or know about Natural Cycles' intrusion at the time it occurred. Plaintiffs and Class Members never agreed that it could disclose their intimate health data.

236.    Plaintiffs and Class Members did not consent to, authorize, or know about Natural Cycles' intrusion at the time it occurred. Plaintiffs and Class Members never agreed that their intimate health data would be collected or disclosed to third parties, including to Mixpanel, Google, AddShoppers, and TikTok.  Defendant effectively placed third parties in the middle of communications to which they were not authorized.

237.    Natural Cycles' intentional intrusion on Plaintiffs and Class Members' solitude or seclusion without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected, based on Natural Cycles' repeated assurances, that their intimate health data would not be disclosed. Natural Cycles's conduct is especially egregious as it placed trackers on its website that collected reproductive health and sexual data even for website users that specifically chose to "reject" all non-essential cookies.

238.    The surreptitious taking and disclosure of intimate health data from Plaintiffs and Class Members was highly offensive because it violated expectations of privacy that have been established by social norms, CMIA, and CIPA. Further, the disclosure of intimate reproductive and sexual health data by Natural Cycles to third parties violated its own representations.

239.    Given the extremely intimate nature of the data Natural Cycles collected and disclosed, such as private details about users' sexual activity, menstrual cycles, and physical and mental health, this kind of intrusion would be, and is in fact, highly offensive to a reasonable person.

240.    As a result of Natural Cycles' actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

241.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Natural Cycles' invasion of their privacy and are entitled to just compensation, including monetary damages.

242.    Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Natural Cycles as a result of its

intrusions upon Plaintiffs' and Class Members' privacy.

243.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Natural Cycles' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are warranted to deter Natural Cycles from engaging in such conduct in the future.

244.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**Invasion of Privacy and**
**Violation of the California Constitution, Art. 1, § 1**

245.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

246.    Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I., Section 1.

247.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

248.    The right to privacy in California's constitution creates a right of action against private and government entities.

249.    Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, data, and medical information pursuant to Article One, Section One of the California Constitution.

250.    The confidential and sensitive information, which Natural Cycles intruded upon, intercepted, collected, and disclosed without Plaintiffs' and Class Members' authorization or consent, included intimate health data, such as information concerning users' reproductive health, including their pregnancy status, whether to bear children or prevent pregnancy, menstrual cycle

data, fertility information, birth control usage, and sexual health indicators. Such information is protected "medical information" under California law. Cal. Civ. Code §§ 56 *et seq.*.

251.    Natural Cycles' actions constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the data collected and shared to third parties for marketing and analytics purposes was highly sensitive and personal, as protected by the California Constitution and CMIA; (ii) Natural Cycles did not have authorization or consent to use this information for purposes other than needed to provide the App services; and (iii) the invasion deprived Plaintiffs and Class members the ability to control the circulation of said information, which is considered a fundamental privacy right.

252.    Natural Cycles' invasion violated the privacy rights of thousands of Class Members, including Plaintiffs, without authorization or consent. Natural Cycles' conduct constitutes a severe and egregious breach of social norms.

253.    As a result of Natural Cycles' actions, Plaintiffs and Class Members have sustained damages and will continue to suffer damages as a direct and proximate result of Natural Cycles' invasion of privacy.

254.    Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Natural Cycles as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

255.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Natural Cycles' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Natural Cycles from engaging in such conduct in the future.

256.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**California Invasion of Privacy Act, Cal. Penal Code § 631**
***(On Behalf of Plaintiffs and the Classes)***

257.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully

set forth herein.

258.    The California Invasion of Privacy Act begins with its statement of purpose:

The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

259.    California Penal Code 631(a) provides a remedy against, inter alia:

Any person who… intentionally taps, or makes any unauthorized connection, whether physically, electrically, …, or otherwise, with any telegraph or telephone wire, line, cable, or instrument … or who willfully andcwithout the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

260.    Defendant is a "person" within the meaning of Cal. Penal Code § 631.

261.    Section 631(a) is not limited to phone lines, but also applies to technologies such as computers, the Internet, and email. See *Matera v. Google Inc*., 2016 WL 8200619, at *18-21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); see also *Bradley v. Google, Inc*., 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

262.    Each of the third parties is a "separate legal entity that offers 'software-as-a service' and [is] not merely a passive device." *Saleh v. Nike, Inc*., 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the third parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for

their own business purposes. Accordingly, the third-party entities were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

263.    Penal Code § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

Cal. Penal Code § 631(a).

264.    Under § 631(a), Defendants must show they had the consent of all parties to a communication.

265.    Natural Cycles' website caused Plaintiffs and Class Members' browsers to store third-party cookies and load third-party tracking pixels. Natural Cycles' mobile app similarly integrated third-party tracking technologies through embedded SDKs.  Both the website and the App transmitted private reproductive and sexual health information—including referring URLs, session information, unique user and device identifiers, and IP based geolocation data—to third parties without Plaintiffs' and Class Members' consent.

266.    By configuring the website and App in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise enabled third parties to wiretap Plaintiff and Class

Members using third parties' cookies and tracking devices and to accomplish the wrongful conduct alleged herein. By allowing third parties to duplicate and/or divert its user's GET Requests to Mixpanel's and other third-party servers, Defendants facilitated the interception and simultaneous transmission to third party processors of Plaintiffs and other Class Members' private information while the information was "in transit" without their informed authorization or consent.

267.    The information communicated between Plaintiffs and Class members and Defendants was transmitted to or from the State of California where Plaintiffs and Class Members are all located. Some of the third parties, including Mixpanel and Google, maintain their principal places of business in California.  The information was wiretapped while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state.

268.    Defendants enabled third parties to the communication to "read" the communication for the purposes of the statute. Mixpanel receives and sees the information that Plaintiffs and Class Members communicated to Defendants via the onboarding questionnaire and elsewhere on the App and used that information to generate reports about Plaintiffs and Class Members for Defendants' own advertising purposes.

269.    At all relevant times, by their cookies and relevant software code, Mixpanel, Google, AddShopper, and TikTok's code read or attempted to read and/or learned the contents or meaning of electronic communcations of Plaintiffs and Class Members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place in California.

270.    Defendants facilitated these communications "without authorization" of Plaintiffs and Class Members.

271.    Plaintiffs' and Class Members' communications of private information with Defendants on and through the App were intended to be confined to the parties.

272.    Plaintiffs and Class Members were using what they understood to be Defendants' secure platform and no indication was given that their private reproductive and sexual health information would be shared with or viewed by any unauthorized third party. The circumstances

reasonably indicate that Plaintiffs and Class Members desired their communications with Defendant to be confined to the parties thereto.

273.    Hence, Defendants allowed Mixpanel, AddShoppers, Google and TikTok to "intentionally tap … or make [an] unauthorized connection" with respect to Class Members' communications by placing third party tracking code on its website and App, without "the consent of all parties" including Plaintiffs and Class Members.

274.    Defendants, thus, "aid[ed], agree[d] with, employ[ed], or conspire[d] with" third party including for marketing and analytics services by allowing such entities to "tap" communications on its website without "the consent of all parties" including Plaintiffs and Class Members, and thereby violated CIPA.

275.    Despite not having any authorization from Plaintiffs or Class Members, Defendants aided, agreed with, or conspired with third parties, Mixpanel, AddShoppers, Google and TikTok to permit it to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

276.    Class Members reasonably expected that their communications with Defendants would be solely between themselves and Defendants and would remain confidential.

277.    Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive medical information and reproductive and sexual health information have been collected, viewed, accessed, stored, and used by Mixpanel, Google, TikTok, AddShoppers (and others) and has not been destroyed. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law and are entitled to injunctive relief.  Plaintiffs and Class Members seek a permanent injunction under Penal Code § 637.2 enjoining Defendants from engaging in further conduct in violation of Cal. Penal Code § 630, et seq.

278.    Cal. Penal Code § 637.2(a) provides that any person who has been injured by a violation of this chapter [including Penal Code §§ 630 and 631] may bring an action against the person who committed the violation for the greater of five thousand dollars ($5,000) per violation

or three times the amount of actual damages, if any, sustained by the plaintiff.

279.    Cal. Penal Code § 637.2(b) provides that "[a]ny person may . . . bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a)."

280.    Cal. Penal Code § 637.2(c) further provides, "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

281.    Defendants are therefore liable to Plaintiffs and the Class for, at a minimum, statutory damages of $5,000 per violation and Plaintiffs and Class Members are also entitled to injunctive relief.

282.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

**FIFTH CLAIM FOR RELIEF**
**Unlawful Recording of and Eavesdropping Upon Confidential Communications**
**(Violation of California Penal Code § 632)**
**(on behalf of Plaintiffs and the Classes)**

283.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

284.    California Penal Code § 632 prohibits using "an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication"…"intentionally and without the consent of all parties to a confidential communication."

285.    Penal Code § 632 applies to any communications made "by means of a telegraph, telephone, *or other device*, except a radio." (emphasis added.)  Thus, § 632 applies to communications made over the internet.  *R.C. v. Sussex Publishers, LLC*, No. 24-CV-02609-JSC, 2025 WL 948060, at *8 (N.D. Cal. Mar. 28, 2025).

286.    Mixpanel's tracking technologies embedded into the Natural Cycles website and app, and AddShoppers, Google and TikTok's tracking technologies embedded into the Natural Cycles website are electronic amplifying or recording devices for purposes of § 632.  The Mixpanel, AddShoppers, Google and TikTok code duplicates and records a user's interaction in real-time as the user navigates the page, including recording any information that the user may input or select

and records the links that the user clicked. The measurement code also collects and records information from the browser, such as the language setting, the type of browser and the device and operating system on which the browser is running.

287.    Section 632 defines a "confidential communication" to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

288.    Plaintiffs and Class Members' personal and private communications with Natural Cycles, including their submission of sensitive medical information such as reproductive health data, including their pregnancy status, menstrual cycle data, fertility information, birth-control usage, and sexual health indicators, were confidential communications for purposes of § 632.

289.    Because Defendants did not disclose to Plaintiffs or Class Members that their private communications, containing protected personally identifiable medical information, were being recorded and/or eavesdropped upon by third parties (including third-parties whose tracking code executed even after users rejected non-essential cookies), Defendants did not obtain, and could not have obtained, Plaintiffs or the Class Members' express or implied advance consent to third parties recording or monitoring of those communications.  Nor could Plaintiffs and Class Members have known that this highly personal and sensitive information was being transmitted in identifiable form to third parties.

290.    As a result, Plaintiffs and Class members had an objectively reasonable expectation that their confidential communications were not being recorded and/or eavesdropped upon by third-parties. That expectation and its objective reasonableness arise, in part, from the objective offensiveness of surreptitiously recording and/or eavesdropping upon individuals medically-sensitive fertility and pregnancy status, menstrual cycle, hormone levels, birth control use, sexual activity, among other protected reproductive health information.

291.    By (1) installing and embedding third-party tracking code on its website and app without proper safeguards to preserve the confidentiality of users' communications and (2) contemporaneously redirecting and transmitting Plaintiffs' and Class Members' confidential

communications through the Mixpanel, AddShoppers, Google Analytics, TikTok (and others) website tracking technology, Natural Cycles permitted, encouraged, and gave substantial assistance to these third-parties to eavesdrop upon and/or record its website and App users' confidential communications through an electronic amplifying or recording device. By so doing, Defendants violated § 632.

292.    Defendants' conduct as described above violated California Penal Code § 632. Under Penal Code § 637.2, Plaintiffs and Class Members are therefore entitled to injunctive relief and $5,000 in statutory damages per violation, the amount deemed proper by the California Legislature, even in the absence of proof of actual damages.

## SIXTH CLAIM FOR RELIEF
**(Use of a Pen Register in Violation of the California Invasion of Privacy Act)**
**(California Penal Code § 638.51)**
**(on behalf of Plaintiffs S.S., A.S., M.F. and the Subclass)**

293.    Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

294.    California Penal Code § 638.51(a) proscribes any "person" from install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

295.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

296.    The cookies and the corresponding software code installed by Defendants on the Natural Cycles website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address, device identifiers, and user-agent information—from the electronic communications transmitted by Plaintiffs S.S., A.S., M.F. and the Subclasses' computers or devices. Cal. Penal Code § 638.50(b).

297.    At all relevant times, Defendants caused third parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class Members' browsers

and devices, and/or to be used to transmit Plaintiffs and Class Members' IP address and user-agent information. *See Greenley v. Kochava*, 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.,* 754 F. Supp. 3d 924, 928–29 (N.D. Cal. 2024); *Fregosa v. Mashable, Inc.,* 2025 WL 2886399, at *2 (N.D. Cal. Oct. 9, 2025).

298.     Some of the information collected by AddShoppers third parties' cookies and the corresponding software and Mixpanel's tracking code, including IP addresses and user-agent information, does not constitute the content of Plaintiffs and the Class Members' electronic communications with the website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up; citations omitted).

299.     Plaintiffs and Subclass Members did not provide their prior consent to Defendants' use of cookies and the corresponding tracking software. On the contrary, Plaintiffs and the Subclass Members informed Defendants that they did not consent to the Natural Cycles' use of cookies by managing cookie settings to reject all non-essential cookies in Natural Cycle's cookie consent banner.

300.     As alleged above, AddShoppers and Mixpanel trackers collect users' IP addresses and device identifiers (e.g. device type, browser type, persistent identifiers) enabling cross-site recognition and targeted advertising.

301.     Defendants did not obtain a court order to install or use the cookies and corresponding software to track and collect Plaintiffs and Subclass Members' IP addresses and user-agent information.

302.     Pursuant to Penal Code § 637.2(a)(1), Plaintiff and Subclass Members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a) and injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

303.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein and further allege as follows.

304.    Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

305.    Plaintiffs and Class members conferred a benefit upon Defendants in the form of valuable sensitive personal and reproductive and sexual health data that Natural Cycles collected from Plaintiffs and Class members, without authorization and proper compensation.

306.    Natural Cycles has collected, disclosed, and otherwise misused this information for its own gain, providing Natural Cycles with economic, intangible, and other benefits, including substantial monetary compensation from third parties who received Plaintiffs and Class Members' sensitive personal data.

307.    Defendants were also unjustly enriched as a result of its wrongful conduct, including through its failure to obtain Plaintiff and Class members consent to sharing and profiting from their reproductive and sexual health data, and their medical conditions. Defendants were further unjustly enriched by misrepresenting that users could reject all non-essential cookies and by causing third parties to store cookies and load third-party tracking pixels on Plaintiffs and Class members' devices and browsers, which allowed the third parties to track and collect users' private reproductive health and sexual health activity information.

308.    The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California for Defendants to be permitted to retain any of the profits or other benefits they derived from the unlawful and unconscionable methods, acts, and trade practices alleged in this Complaint.

309.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the classes they seeks to represent, respectfully request that he Court enter an order:

a)      Certifying this action as a class action, appointing Plaintiffs as class representatives for the Class; and appointing their attorneys as counsel for the Class;

b)      Finding that Defendants' conduct was unlawful, as alleged herein;

c)      Awarding declaratory relief against all Defendants;

d)      Awarding such injunctive and other equitable relief as the Court deems just and proper;

e)      Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

f)      Permanently enjoining Natural Cycles from engaging in the unlawful practices alleged herein;

g)      Awarding all other relief available under the various statutory causes of action asserted herein;

h)      Awarding reasonable attorneys' fees, costs, and expenses;

i)      Awarding Plaintiffs and Class Members pre and post-judgment interest; and

j)      For such other and further relief as may be just and proper.

## X.    JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated: December 4, 2025                    Respectfully submitted,

*Grace E. Parasmo*
Grace E. Parasmo (SBN 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
8149 W. Santa Monica Blvd., #611
Los Angeles, CA 90046
Telephone:  (646) 509-3913

*Attorneys for Plaintiffs S.A., S.S., A.S.*
*and M.F, individually and on behalf of*
*a class of similarly situated individuals*