**PARASMO LIEBERMAN LAW**
Grace E. Parasmo (SBN 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
8149 W. Santa Monica Blvd., #611
West Hollywood, California 90046
Telephone: (646) 509-3913

*Counsel for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

S.A., S.S., A.S., and M.F., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATURALCYCLES USA CORPORATION AND NATURALCYCLES NORDIC AB,

Defendants.

Case No. 3:25-cv-10421-WHO

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION, STAY PROCEEDINGS, AND DISMISS S.A. AND A.S.'S CLASS CLAIMS**

[Declaration of S.A., Declaration of A.S., and Declaration of Grace E. Parasmo *filed concurrently*]

Judge: Hon. William H. Orrick
Date: July 8, 2026
Time: 2:00 pm
Location: Courtroom 2, 17th Floor

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

III. ARGUMENT ..... 3

A. Natural Cycles failed to establish the formation of an agreement to arbitrate ..... 3

1. Natural Cycles did not put consumers on reasonably conspicuous notice of its Terms. ..... 3

i. Natural Cycles' screen was visually cluttered and disconnected the Terms from the action button. ..... 4

ii. Natural Cycles directed users' attention to other disclosures ..... 6

iii. The medical context and the checkout flow set user expectations about the Terms ..... 7

iv. The context of the transaction reinforces the non-conspicuousness of the Terms ..... 7

v. Even if users clicked the Terms, the Terms were internally confusing and contradictory regarding dispute resolution. ..... 8

2. Plaintiffs did not "unambiguously" manifest assent to the Terms ..... 9

i. Clicking "Accept" did not unambiguously signify agreement to Natural Cycles' Terms ..... 9

B. Even if Plaintiffs are bound, the 2022 Terms—not the 2025 update—govern ..... 12

C. The 2025 modification cannot retroactively apply to claims that already accrued ..... 15

D. Plaintiffs did not "clearly and unmistakably" delegate the question of arbitrability to the arbitrator ..... 16

E. The delegation clause specifically and the arbitration agreement as a whole are procedurally unconscionable. ..... 17

F. The delegation clause specifically and the arbitration agreement as a whole are substantively unconscionable ..... 20

G. Since there is no FAA preemption, the class action waiver is unenforceable under California law ..... 23

H. The Court should not stay M.F. and S.S.'s non-arbitrable claims ..... 24

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## Cases

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (2000) .................... 17, 23

*Avery v. Integrated Healthcare Holdings, Inc.*,
218 Cal. App. 4th 50 (2013) .................... 15

*Avery v. TEKsystems, Inc.*,
757 F. Supp. 3d 973 (N.D. Cal. 2024) .................... 24

*Baltazar v. Forever 21, Inc.*,
62 Cal. 4th 1237 (2016) .................... 18

*Berman v. Freedom Fin. Network*, LLC,
30 F.4th 849 (9th Cir. 2022) .................... passim

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) .................... 17

*Chabolla v. ClassPass, Inc.*,
129 F.4th 1147 (9th Cir. 2025) .................... 5, 7, 11, 12

*Compare Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020).................... 13

*Congdon v. Uber Techs., Inc.*,
226 F. Supp. 3d 98 (N.D. Cal. 2016) .................... 25

*Cruz v. Tapestry, Inc.*,
113 Cal. App.5th 943 (2025) .................... 6, 7

*Discover Bank v. Superior Court*,
36 Cal. 4th 148 (2005) .................... 23

*Fisher v. MoneyGram Int'l, Inc.*,
66 Cal. App. 5th 1084 (2021) .................... 18, 22

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025).................... 24

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .................... 12

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .................... passim

*Gostev v. Skillz Platform, Inc.*,
88 Cal. App. 5th 1035 (2023) .................... 19, 21, 23

*Gutierrez v. Autowest, Inc.*,
114 Cal. App. 4th 77 (2003) .................... 21

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024) ........ 17, 19, 23

*Herzog v. Superior Court,*
101 Cal. App. 5th 1280 (2024) ........ 4

*In re Ring LLC Priv. Litig.*,
No. CV 19-10899-MWF (RAOx) 2021 WL 2621197 (C.D. Cal. June 24, 2021)........ 5

*In re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig*.,
298 F. Supp. 3d 1285 (N.D. Cal. 2018) ........ 25

*Ireland-Gordy v. Tile, Inc*.,
No. 25-403, 2026 WL 594859 (9th Cir. Mar. 3, 2026)........ 14

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........ 4, 7

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) ........ 12

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) ........ 21

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) ........ 22, 23

*Marron v. HealthSource Glob. Staffing, Inc.,*
No. 19-CV-01534-KAW, 2019 WL 4384287 (N.D. Cal. Sept. 13, 2019) ........ 17

*McGhee v. N. Am. Bancard, LLC*
(9th Cir. 2019) 755 F. App'x 718 ........ 8

*Nagrampa v. MailCoups, Inc.*
469 F.3d 1257 (9th Cir. 2006)........ 18

*Oberstein v. Live Nation Ent., Inc*.,
60 F.4th 505 (9th Cir. 2023) ........ 3, 10

*Parada v. Superior Ct.,*
176 Cal. App. 4th 1554 (2009) ........ 19

*Peleg v. Neiman Marcus Grp., Inc*.,
204 Cal. App. 4th 1425 (2012) ........ 15

*Peng v. First Republic Bank*,
219 Cal. App. 4th 1462 (2013) ........ 15

*Pliszka v. Axos Bank*,
No. 24-CV-445-RSH-SBC, 2024 WL 4194338 (S.D. Cal. Sept. 13, 2024)........ 14

*Pokorny v. Quixtar, Inc.,*
601 F.3d 98 (9th Cir. 2010)........ 18

*Polimaster Ltd. v. RAE Sys., Inc.*,
623 F.3d 832 (9th Cir. 2010) ..... 21

*Ramirez v. Trusper Inc.*,
No. 24-6434, 2025 WL 2955231 (9th Cir. Oct. 20, 2025) ..... 7

*Ramirez v. Trusper, Inc.*,
No. 5:24-CV-02012-EJD, 2024 WL 4479862 (N.D. Cal. Oct. 11, 2024) ..... 7

*Rios v. HRB Digit. LLC*,
807 F. Supp. 3d 975 (N.D. Cal. 2025) ..... 20

*Rushing v. Williams-Sonoma, Inc.*,
No. 16-CV-01421-WHO, 2025 WL 2391394 (N.D. Cal. Aug. 18, 2025) ..... 16

*Sarhadi v. Pear Health Labs, Inc.*,
No. 24-CV-07921-TLT, 2025 WL 1350033 (N.D. Cal. Apr. 18, 2025) ..... 5

*Schlueter-Beckner v. SimpliSafe, Inc.*,
No. 3:25-CV-01764 (CRB), 2025 WL 2162948 (N.D. Cal. July 30, 2025) ..... 16

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ..... 4, 11

*Shahtout by & through Shahtout v. California Psychcare, Inc.*,
562 F. Supp. 3d 913 (C.D. Cal. 2022) ..... 21

*Shaw v. Regents of Univ. of Cal.*,
58 Cal. App. 4th 44 (1997) ..... 16

*Sifuentes v. Dropbox, Inc.*,
No. 20-CV-07908-HSG, 2022 WL 2673080 (N.D. Cal. June 29, 2022) ..... 14

*Szuts v. Dean Witter Reynolds, Inc.*,
931 F.2d 830 (11th Cir. 1991) ..... 21

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) ..... 21

*Williams v. DDR Media, LLC*,
No. 22-CV-03789-SI, 2023 WL 2314868 (N.D. Cal. Feb. 28, 2023) ..... 12

**Statutes**

9 U.S.C. § 3 ..... 24

Cal. Civ. Code § 56.37 ..... 22

Cal. Civ. Code § 56.101 ..... 22

Cal. Civ. Code § 56.10 ..... 22

Cal. Penal Code § 637.2 ..... 22

Cal. Penal Code § 630 ..... 22

## I. INTRODUCTION

This putative class action arises out of Natural Cycles' systematic disclosure of users' most intimate reproductive and sexual health information—including pregnancy status, menstrual cycle data, fertility goals, sexual activity, and medical conditions—to third-party advertising and analytics companies, without authorization or consent. Compl. ¶ 1. Natural Cycles markets its application as a privacy-protective, FDA-cleared medical device and assures users their sensitive health information will never be shared with third parties without consent. *Id.* ¶ 2. Yet Natural Cycles engineered its website and mobile application to embed hidden tracking technologies of Mixpanel, AddShoppers, Google, and TikTok, which captured users' personally identifiable information linked to their reproductive and sexual health data in real time—even when users rejected non-essential cookies.[1] *Id.* ¶¶ 3–8.

Natural Cycles moves to compel only S.A. and A.S. to arbitration. S.S. and M.F. are undisputedly not subject to any arbitration agreement because S.S. did not create an account and M.F. opted out.[2] For the reasons set forth below, Natural Cycles has failed to establish that S.A. or A.S. agreed to its Terms or to arbitrate their claims. And even if they had, the arbitration agreement and the delegation clause it contains are unenforceable as procedurally and substantively unconscionable.

*First*, Natural Cycles did not provide reasonably conspicuous notice of its Terms or obtain unambiguous assent. Early in the sign-up flow before users reached the checkout page, the "Before you start" screen presented users with fifteen items and seven hyperlinks in a single unbroken scroll spanning three to five screens, with the reference to Natural Cycles' Terms near the top and the "Accept" button at the bottom, separated by twelve intervening items.[3] Nothing connected the "Accept" button to Natural Cycles' Terms.[4] At the later checkout page, Natural Cycles required users to actively check a box agreeing to specific terms—but its own Terms of

---

[1] The full factual background is set forth in Plaintiffs' Complaint (ECF. 1) and concurrently filed Opposition to Natural Cycles' Motion to Dismiss.

[2] Compl. ¶ 171; Karlsson Decl. ¶¶ 9, 22.

[3] Parasmo Decl. Exs. A, B; Karlsson Decl. Ex. B.

[4] *Id.*

Service were not among them.[5]

*Second*, even if S.A. and A.S. were bound, the 2022 Terms govern, not the 2025 update, because Natural Cycles cannot establish that S.A. and A.S. assented to the 2025 modification. And the 2025 modification cannot retroactively apply to claims that accrued before any alleged assent.

*Third*, Plaintiffs—unsophisticated consumers—did not clearly and unmistakably delegate arbitrability to the arbitrator. Natural Cycles relies on AAA rules it neither provided nor directed users where to find. Even if Plaintiffs had delegated, the delegation clause and the arbitration agreement are procedurally and substantively unconscionable: the Terms contain contradictory forum clauses (one specifying Swedish courts, another specifying arbitration), impose thousands of dollars in arbitration fees, prohibit the arbitrator from awarding damages, and force California consumers to arbitrate in New York.

*Fourth*, because the arbitration agreement is unenforceable, the FAA does not preempt California's *Discover Bank* rule, under which the class action waiver is also unenforceable.

*Fifth*, the Court should not stay S.S. and M.F.'s claims, which are undisputedly not subject to arbitration, because doing so would not serve the interests of justice.

## II. BACKGROUND

A.S. and S.A. did not see Natural Cycles' Terms of Service or any indication that they were agreeing to arbitrate disputes when they signed up for the app. Both Plaintiffs declare that they do not remember seeing any screen, checkbox, link, or notice that mentioned Natural Cycles' Terms of Service, Terms of Use, arbitration, the American Arbitration Association, waiving their right to a jury trial or giving up their right to go to court. A.S. Decl. ¶ 5; S.A. Decl. ¶¶ 5-9. Neither has ever read any arbitration agreement, arbitration terms, Terms of Use, or Terms of Service in connection with Natural Cycles, not when they signed up, not during their use of the app, and not afterward. A.S. Decl. ¶ 6; S.A. Decl. ¶ 9. A.S. does not recall seeing or noticing any screen, checkbox, link, or button that required her to agree to Natural Cycles Terms of Service or Terms of Use. A.S. Decl. ¶ 5. S.A. specifically declares that she did not see such a link, and nothing

[5] *See* Parasmo Decl. Ex. A-21.

during sign-up drew her attention to the existence of an arbitration clause or suggested to her that she was agreeing to resolve legal disputes privately instead of in court. S.A. Decl. ¶ 7.

A.S. stopped using the Natural Cycles app in or about February 2024 and has not used it since. A.S. Decl. ¶ 8. She cancelled her subscription on or about March 2, 2024. *Id*. S.A. has not used Natural Cycles for fertility tracking or any other purpose since around March 2025. S.A. Decl. ¶ 12.

## III. ARGUMENT

### A. Natural Cycles failed to establish the formation of an agreement to arbitrate

Natural Cycles cannot compel S.A. and A.S. to arbitrate because it cannot show they ever agreed to arbitrate. Under California law, a sign-in wrap agreement is enforceable only if (1) the website provided reasonably conspicuous notice of the terms, and (2) the user took some action that unambiguously manifested assent to those terms. *Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849, 856 (9th Cir. 2022). Natural Cycles fails on both prongs.

#### 1. Natural Cycles did not put consumers on reasonably conspicuous notice of its Terms.

Natural Cycles does not argue that Plaintiffs S.A. and A.S. had actual notice of the Terms of Use. Rather, it attempts to establish contract formation on an inquiry notice theory. Mot. at 10. To determine "whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman,* 30 F.4th at 855.

Clickwraps are generally enforceable. *Oberstein v. Live Nation Ent., Inc*., 60 F.4th 505, 517 (9th Cir. 2023) ("To ensure that an online agreement passes muster, clickwrap is the safest choice"). On the other hand, the enforceability of a sign-in wrap agreement, a hybrid between a clickwrap and a browsewrap, depends solely on whether the website provides inquiry notice and whether the consumer takes an action that manifests "unambiguous" consent to the terms it wishes to bind the consumer to. *Berman*, 30 F.4th at 856.

Here, this agreement is a sign-in wrap agreement because Natural Cycles did not require users to review its Terms of Service and confirm their assent prior to using the app. Karlsson Decl. Ex. B. Natural Cycles concedes that its "agreement" is a sign-in wrap agreement. Mot. at 9.

When analyzing a sign-in wrap "[t]he first step of the inquiry-notice internet contract formation test asks whether "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (*citing Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024); *Herzog v. Superior Court,* 101 Cal. App. 5th 1280, 1296 (2024)). This test has two aspects: the visual design of the webpages and the context of the transaction—considered together. *Godun*, 135 F.4th at 709. This inquiry is "fact-intensive," is informed by the "totality of the circumstances," and resists bright-line rules; "even minor differences in the design elements may make the difference. . ." *Id.* at 709-710 (*citing Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (2021).

Here, Natural Cycles did not put consumers on reasonably conspicuous notice of its terms. Natural Cycles presents two screenshots in its brief that depict the item referencing the Terms of Service ("Terms") as if they appear directly above the "Accept" button. Mot. Figures 2, 3. They are not. Parasmo Decl. Exs. A, B; Karlsson Decl. Ex. B. Further, Natural Cycles presents a PDF of the "Before You Start" page but does not show how it appears on a mobile device or Mac similar to what Plaintiffs A.S. and S.A. used.[6] *See* S.A. Decl. ¶ 4; A.S. Decl. ¶ 4. On an iPhone, the page spans four to five scrollable screens. Parasmo Decl. Ex. A-01-05. On a Mac, it requires approximately three screens of scrolling. Parasmo Decl. Ex. B-01-03. Whether on a laptop, desktop, or mobile device, users were not provided with reasonably conspicuous notice.

#### i. Natural Cycles' screen was visually cluttered and disconnected the Terms from the action button.

At the outset, Natural Cycles claims that the "Before you start" page was presented in an "uncluttered format." Mot. at 10. That is not the case. *See* Parasmo Decl. Exs. A, B. Tellingly, the cropped Figures 2 and 3 in Natural Cycles' motion show only three of the fifteen items on the actual screen. Mot. at 4.

Contrary to Natural Cycles' assertion, its screen presents fifteen discrete disclosure items, seven separate hyperlinks (Terms of Use, Privacy Policy, Instructions for Use, and a second

[6] "[T]he visual elements present on an online website page would differ, given the obvious size constraints, when viewed through a traditional desktop or through a mobile app or on a mobile device." *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2025 WL 2391394, at *4 (N.D. Cal. Aug. 18, 2025) (Orrick, J.)

Privacy Policy link within a sensitive data consent item, social media partners link, and a hyperlink to Google's Terms of Service and Google's Privacy Policy), interactive checkboxes, and multiple "i" information icons—all in a single unbroken scroll with no section breaks, headers, or whitespace separating items of fundamentally different function. Karlsson Decl. Ex. B. The fifteen items mix consumer acknowledgments, regulatory disclaimers, affirmative consents, and optional checked boxes, all marked by three inconsistent visual indicators (bullet points, info icons, and interactive checkboxes) that fail to signal which items, if any, carry legal significance. *Id.*

A Mac user would need to scroll through three screens of content before reaching the "Accept" and "Decline" buttons at the bottom of the screen. Parasmo Decl. Ex. B-01-03. An iPhone user must scroll through approximately four to five screens before reaching those buttons. Parasmo Decl. Ex. A-01-05. The "Terms of Service" hyperlink appears on the first screen, in item three. *Id.* at A-01. The "Accept" button appears on the third to fifth screen. *Id.* at A-05. A user will have processed two to four additional screens of medical disclaimers, efficacy statistics, sexually transmitted infection ("STI") warnings, sensitive data consent language, data retention consent, marketing and data-sharing checkboxes, a doctor consultation warning, and a data withdrawal notice before reaching the buttons that simply state "Accept" and "Decline" with no advisal.

Placing a notice "*directly above or below* the relevant action item in a manner disrupting the natural flow of actions" is more likely to draw the user's attention to the fact that terms apply. *Chabolla v. ClassPass, Inc.*, 129 F.4th 1147, 1157 (9th Cir. 2025) (emphasis added). Here, the Terms hyperlink is twelve items removed from the "Accept" button, with numerous distracting elements separating them. Courts find such notice insufficient where "there were superfluous items separating the relevant action items from the notice." *Id.*[7]

[7] Natural Cycles cases are easily distinguishable. Mot. at 11. *Sarhadi* dealt with an "uncluttered screen" and there were no intervening text or buttons between the action button and the clear advisal. *Sarhadi v. Pear Health Labs, Inc.*, No. 24-CV-07921-TLT, 2025 WL 1350033, at *8 (N.D. Cal. Apr. 18, 2025), *reconsideration denied*, No. 24-CV-07921-TLT, 2025 WL 4644296 (N.D. Cal. July 11, 2025). And *In re Ring LLC Priv. Litig.*, No. CV 19-10899-MWF (RAOx) 2021 WL 2621197, at *5 (C.D. Cal. June 24, 2021) the hyperlink was "immediately above or below" the action button.

**ii. Natural Cycles directed users' attention to other disclosures**

Next, Natural Cycles used checkboxes to ensure a consumer supplies consent to certain items, such as items 12 and 13, but did not do the same for its "Terms of Service." Parasmo Decl. Ex. A, B. The checkboxes draw a user's attention away from the bullet points, including the Terms reference, reducing its prominence and any significance attached to them. *See, e.g., Cruz v. Tapestry, Inc.*, 113 Cal. App.5th 943, 959 (2025), *as modified* (Aug. 27, 2025) (finding lack of reasonably conspicuous notice in light of clutter and because "[w]hereas appellants have utilized a graphical interface to ensure a consumer supplies billing information, they have not done the same to alert a consumer to the Terms of Use (e.g., by requiring a consumer to check a box next to the notice text)").

Moreover, item three states: "I agree to Natural Cycles' Terms of Service and Privacy policy and *have read* the Instructions for use." Karlsson Decl. Ex. B. (emphasis added). The user is told to read only the Instructions for Use, not the Terms of Service or the Privacy Policy, implying the Terms and Privacy Policy are not of importance. *Cf. Godun,* 135 F.4th at 713 (where notice is not prominent it can create the appearance to user that it is "not important to the transaction.")

Further, the list of items includes a separate item stating: "I consent to Natural Cycles' use of sensitive personal data that I add to the app, such as health and intercourse data, to enable and provide the services. I can withdraw my consent at any time, *as described in the Privacy Policy*, but Natural Cycles may not be able to provide the services without this data." Karlsson Decl. Ex. B. (emphasis added). This creates the impression that the screen itself is surfacing the material terms of the Privacy Policy for the user's review. By extracting and reciting one specific provision, the screen presentation implicitly represents that this is the provision the user most needs to know about. Each of these design choices steered users away from the Terms, undermining inquiry notice.

**iii. The medical context and the checkout flow set user expectations about the Terms**

The information on the screen points the user toward medical and related privacy information. The screen describes Natural Cycles as “a registered medical device” used “as birth control and to plan pregnancy” with “93% effective[ness] with typical use.” Parasmo Decl. Exs. A, B; Karlsson Decl. Ex. B. It warns users about STIs, the importance of abstaining or using protection on “red days,” and the need to consult a doctor if pregnancy poses a health risk. *Id.* And it asks users to consent to Natural Cycles’ use of their “health and intercourse data.” *Id*.

A reasonable user would expect the Terms to involve the same subject matter. *See Ramirez v. Trusper Inc*., No. 24-6434, 2025 WL 2955231, at *1 (9th Cir. Oct. 20, 2025) (“A reasonable user would expect these terms and conditions to involve the same subject matter. . . and not all of the terms in the hyperlinked webpage, including the requirement of binding arbitration in the event of a legal dispute,”) (cleaned up; citations omitted). Those expectations were reinforced at checkout, as explained next.

**iv. The context of the transaction reinforces the non-conspicuousness of the Terms**

“The nature of an agreement may anticipate some sort of continuing relationship . . . that would require some terms and conditions.” *Chabolla*, 129 F.4th at 1155 (cleaned up) (citations omitted). “The context of the transaction is a non-dispositive factor under California law, used to evaluate whether a website’s notice is sufficiently conspicuous. Courts must still evaluate the visual aspects of the notice . . .” *Keebaugh*, 100 F.4th at 1019.

Users are accustomed to finding terms upon checkout. At checkout, Natural Cycles required users to actively consent via a clickwrap to a defined set of terms: payment method, auto-renewal, refund policy, and Google’s Terms of Service and Privacy Policy. *See* Parasmo Decl. Ex. A-20-21. The checkbox states “I agree to the terms below.” *Id.* Natural Cycles knew how to require active consent to terms it wanted to bind users to. It chose not to do so for the Terms of Service it now seeks to enforce. *See, e.g., Cruz,* 113 Cal. App. 5th at 959. A reasonable user would have understood the checkout clickwrap to contain the operative terms—not a sign-in wrap several screens earlier. This factor favors Plaintiffs, but at the very least should weigh as neutral. *See*

*Chabolla*, 129 F.4th at 1156. ("Viewed as a whole, the 'context of the transaction' at issue here neither weighs in favor of nor against the notice requirement"). And even in a forward-looking relationship, Natural Cycles "still had the obligation to ensure that the visual placement of the notice. . . was conspicuous." *Ramirez v. Trusper, Inc.,* No. 5:24-CV-02012-EJD, 2024 WL 4479862, at *4 (N.D. Cal. Oct. 11, 2024), *aff'd*, No. 24-6434, 2025 WL 2955231 (9th Cir. Oct. 20, 2025).

Thus, Natural Cycles did not provide users with reasonably conspicuous notice of the terms it sought to enforce. As the Ninth Circuit has made clear, "[b]ecause online providers have complete control over the design of their websites. . . the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[.]" *Berman,* 30 F.4th at 857 (internal citations omitted).

**v. Even if users clicked the Terms, the Terms were internally confusing and contradictory regarding dispute resolution.**

Even if users opened the Terms, the Terms themselves failed to provide clear notice that users were agreeing to arbitration. In Section 1, a user would have seen "You and Natural Cycles agree to the jurisdiction of the courts of Sweden to resolve any dispute. . . that arises in connection with these Terms. . . including any non-contractual disputes and claims . . ." Karlsson Decl. Ex. C § 1.9.

If a user reads further, they would come upon the arbitration provision at Section 14 on page 10 of the Terms. *Id.* Between sections 13 and 14, in boxed text appears the caveat that the "Arbitration Agreement applies only to users in the United States." *Id.* This caveat appears only once, and in boxed text. *Id.* But per Natural Cycles' own instructions on reading its Terms "boxed text. . . is not legally binding." Karlsson Decl. Ex. C (preamble).

Reasonable users would have no reason to read past the introduction, which designates Swedish courts as the forum. And even if they did, they would not know which provision governs—since Natural Cycles says the boxed text is not legally binding. Thus, even if users were put on inquiry notice of the Terms, they were not put on inquiry notice of the arbitration terms specifically. *Cf. McGhee v. N. Am. Bancard, LLC* (9th Cir. 2019) 755 F. App'x 718, 719 (finding

"Terms of Use" did not incorporate by reference a "User Agreement" with an arbitration agreement, where the underlying district court decision shows the Terms of Use also contained a confusingly conflicting federal court forum selection clause and a merger clause that appeared to exclude the User Agreement.) Because Natural Cycles did not put S.A. and A.S. on reasonably conspicuous notice of the Terms, they could not have manifested "unambiguous" consent to the terms. But even if Plaintiffs were provided with reasonably conspicuous notice, as explained next, they did not manifest "unambiguous" assent.

**2. Plaintiffs did not "unambiguously" manifest assent to the Terms**

"Step two asks a different question: whether there is an unambiguous manifestation of assent." *Godun*, 135 F.4th at 713. "Step two does not look to the context of the transaction but relies on the explicit advisement of what actions will be taken to signify assent." *Id.*

To satisfy Step Two "[e]ven strongly implicit advisement isn't enough—a webpage must explain that certain actions will be understood by the offeror to signal assent to contractual terms." *Id.* at 711 (*citing Berman*, 30 F.4th at 857).

**i. Clicking "Accept" did not unambiguously signify agreement to Natural Cycles' Terms**

After scrolling through the fifteen-item list, including two checkbox decisions about marketing communications and data sharing, a doctor-consultation warning, and a notice about the user's ability to withdraw consent, the user is presented with a button that simply states "Accept." Parasmo Decl. Exs. A, B. Natural Cycles claims that the screen's opening header — "Before you start, please read and accept the following"—serves as the implicit advisal connecting the "Accept" button to its Terms of Service. Mot. at 12. But that header sits fifteen items above the "Accept" button. The only text below the "Accept" button reads: "This site is protected by reCAPTCHA and **Google Privacy Policy and Terms of Service apply**." (emphasis added; hyperlink in original).

*First*, no advisal connects the "Accept" button to the terms of service reference in item three. *Godun*, 135 F.4th at 713. ("an advisal that simply states that 'I understand and agree to the Terms and Conditions' but fails to 'indicate to the user what action would constitute assent' is not

enough to invite an unambiguous manifestation of assent.") (citations omitted). The screen does not say, for example, "By clicking Accept, you agree to Natural Cycles' Terms of Service." The Accept button says only "Accept." Nothing on the screen warns the user that tapping "Accept" constitutes agreement to Natural Cycles' Terms of Service or requires the user to arbitrate future disputes. *Godun*, 135 F.4th at 713 ("nothing about the text on an action button by itself can overcome the rule, in the inquiry-notice or "sign-in wrap" context, mandating explicit advisement in advisal language so that there is unambiguous manifestation of assent").

The law is clear, for the consent to be unambiguous, only an explicit advisement can suffice. And "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman,* 30 F.4th at 857. Further, "the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858. Natural Cycles cites only one case for its proposition that S.A. and A.S. "unambiguously" consented but in that case the explicit advisal was undisputed. *Oberstein*, 60 F.4th at 517 ("Ticket Purchasers do not contest that the notices at issue explicitly alert the user that by creating an account, signing in, or purchasing a ticket, and proceeding to the next page, the user 'agrees to our Terms of Use.'")

Even where an explicit advisal exists, the Ninth Circuit has found assent lacking when the advisal was not located directly above or below the button that a consumer must click to assent to terms. *Godun*, 135 F.4th at 712 (finding consumer not bound because "[t]he advisal is not, however, located directly above or below the action button and is displayed in relatively small text").

*Second*, the items presented are not all things capable of being accepted. Natural Cycles' theory requires that clicking "Accept" signaled agreement to the entire fifteen-item list. But the items are a mix of factual statements about the product, user rights, medical advice, user attestations, and acknowledgments. A user reading this list cannot reasonably understand—let alone unambiguously consent—that the operative act of "Accept" is responding to the entire list, because "Accept" is grammatically and logically appropriate for only some of the items.

The items separately state "Natural Cycles is 93% effective with typical use…", "If pregnancy presents a significant risk", "I confirm", "I confirm I understand", "I agree", "have read", "I understand", "I consent", "You can withdraw your consent", "I authorize." Karlsson Decl. Ex. B. It is nonsensical for a user to "Accept" that "Natural Cycles is 93% effective[.]" Nor can a user "Accept", "I want to receive information", and "I authorize Natural Cycles to share certain information about me"—items that require separate checkboxes breaking the flow between the earlier items and the "Accept" button. *See Berman,* 30 F. 4th at 858 (language insufficient to constitute unambiguous assent where the webpages stated "'I understand and agree to the Terms & Conditions,' but [ ] did not indicate to the user what action would constitute assent to those terms and conditions."); *Godun*, 135 F.4th at 712–13 (where the advisal lacked an explanatory phrase but "instead simply said 'I agree' without explaining more" is not enough to constitute "an unambiguous manifestation of assent' to those terms").

The result is there is no indication here that the parties agreed upon the same thing in the same sense. *Godun*, 135 F.4th at 712 *citing Sellers*, 73 Cal. App. 5th at 460 (quotations omitted). ("The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense,'" and "[i]f there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation.")

*Third*, a reasonable internet user looking directly beneath the "Accept" button sees a single statement: "this site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply." Karlsson Decl. Ex. B. The user has every reason to believe that tapping Accept constitutes acceptance of Google's hyperlinked terms because those are the terms the screen identifies as applying directly below the button. *Cf. Chabolla*, 129 F.4th at 1157 (placing notice "directly above or below" action item more likely to draw user's attention).

This pattern continues at checkout. There, Natural Cycles required users to actively consent, via a clickwrap checkbox stating "I agree to the terms below," to Google's Privacy Policy and Terms of Service. *See* Parasmo Decl. Ex. A at 20-21. Notably absent from this list is any reference to Natural Cycles' own Terms of Service. On both the "Before you start" screen and the

checkout clickwrap, Natural Cycles consistently identified Google's terms—but not its own—as the operative terms the user was agreeing to. *See* Parasmo Decl. Exs. A, B.

*Fourth*, there is a verb mismatch between the "I agree to the Terms of Service and Privacy Policy and have read the Instructions for use" and the "Accept" button. Karlsson Decl. Ex. B. "Courts have found no assent where, considering the overall design of the page, there was a discrepancy between the action button and the text of the notice." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 929 (N.D. Cal. 2024). Here, item three, the only item that references the "Terms of Service," states "I agree" and the action button twelve items later states "Accept." Karlsson Decl. Ex. B. *See Chabolla,* 129 F.4th at 1158–59 (no unambiguous manifestation of assent where advisal read "[b]y signing up you agree to our Terms of Use and Privacy Policy," and the only clickable button below it read 'Continue'"); *Williams v. DDR Media, LLC*, No. 22-CV-03789-SI, 2023 WL 2314868, at *7 (N.D. Cal. Feb. 28, 2023) (finding no unambiguous assent where "the notice inform[ed] users that they agree to the Terms of Use by clicking a 'Get Started' button…not the 'CHECK LISTINGS' button"); *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 767 (N.D. Cal. 2025) (holding that advisal stating: "By creating an account or continuing to use a [site] application, website, or software, you acknowledge and agree that you have accepted the Terms of Service and Privacy Policy," was "ambiguous because it describes two actions that constitute assent, but neither matches the 'Continue with Facebook' button that Plaintiff clicked.")

Natural Cycles could have easily stated directly above or below the button: "By clicking the 'Accept' button I agree to Natural Cycles' <u>Terms of Service</u> and <u>Privacy Policy</u>." The defect "could easily have been remedied" with language like "By clicking the Continue >> button, you agree to the <u>Terms & Conditions</u>." *Berman,* 30 F.4th at 858. And where "the language could have been clearer . . . the resulting ambiguity is dispositive." *See Chabolla*, 129 F.4th at 1158.

For these reasons, A.S. and S.A. did not manifest unambiguous assent to the Terms of Service. There is no contract, and the motion to compel arbitration should be denied.

### B. Even if Plaintiffs are bound, the 2022 Terms—not the 2025 update—govern.

Even assuming Plaintiffs were bound by the arbitration agreement within Natural Cycles' Terms of Service (they are not), the 2022 Terms—not the 2025 update—govern.

As an initial matter, the Court must first assess which version of the Terms applies to A.S. and S.A.. Natural Cycles states that when A.S. and S.A. "created their accounts" the July 8, 2022 Terms were "in effect." Karlsson Decl. ¶ 18, Ex. C. Plaintiff A.S. used the app through February 2024, and S.A. used the app through approximately March 2025. Compl. ¶¶ 164, 178. A.S. Decl. ¶ 8; S.A. Decl. ¶ 12. Natural Cycles states it updated its terms on October 27, 2025 months after S.A. stopped using the app, and more than a year and a half after A.S. stopped. Karlsson Decl. ¶ 19. Natural Cycles claims that it sent email notices to S.A. and A.S. around that time at the email address associated with their accounts. Karlsson Decl. ¶ 21. The Notice email stated that "any continued use" of Natural Cycles constituted acceptance of the updated terms. *Id.* Natural Cycles states that "S.A. last opened" the app on January 16, 2026 and A.S. "last opened it" on November 5, 2025. *Id.* at ¶ 23.

Natural Cycles does not assert that either Plaintiff "opened" the app at any other time after the Terms were updated, or at any time after they stopped using the app. And neither Plaintiff "used" the app. A.S. Decl. ¶¶ 8, 12- 13; S.A. Decl. ¶¶ 11-12. S.A. opened the app to cancel additional auto-renewal charges from Natural Cycles that she had discovered and A.S. opened the app to take screenshots to investigate her potential claims. *Id.* Neither used any features of the app. *Id*. Natural Cycles submits no evidence of any other interaction beyond the single "opening" by each Plaintiff.

Moreover, A.S. was not a paying member at the time she "opened" the app and thus she could not have "used" it. A.S. Decl.¶ 13. Natural Cycles' own app confirms this. *See* Parasmo Decl. Ex. C. When users, like A.S., are no longer paying for the service the app has a pop-up screen, which states, in relevant part, "Buy a new subscription to start *using* Natural Cycles again." (emphasis added). *Id.*

And the email that A.S. received specifically acknowledged that she was no longer paying for the app and was only receiving the email because Natural Cycles had her email on file when she first registered. A.S. Decl. ¶¶ 9-10. The email stated, in part, "You don't need to take any action to accept the updated Terms. If you continue to use any of our services in the future, it means you agree to the new Terms." *Id.* at ¶ 10. But A.S. did not use Natural Cycles' services

after that email. She stopped using them in 2024. *Id.* at ¶ 8.

Even if a single opening of the app long after Plaintiffs stopped using the service could constitute "continued use," it would not bind them to the updated Terms. *Compare Stover v. Experian Holdings*, *Inc.*, 978 F.3d 1082, 1085–86 (9th Cir. 2020) ("whether a single website visit four years after assent to a contract containing a change-of-terms provision is enough to bind the parties to terms in the then-current version of the contract of which the visitor is unaware. We answer in the negative.") *with Ireland-Gordy v. Tile, Inc.*, No. 25-403, 2026 WL 594859, at *4 (9th Cir. Mar. 3, 2026) (unpublished) (finding unambiguous assent where one plaintiff used the app, including an app feature four times months after the notice email was sent and another plaintiff used the app "periodically" for months after notice email).

In any event, whether an email notice constitutes assent is a "fact-intensive" inquiry analyzed under the same principles as above. *Ireland-Gordy*, 2026 WL 594859, at *3 n.5 (holding that precedents concerning contract formation on websites apply to notices sent by email). "In this analysis, we look to the email's 'design and content,' . . . and consider whether it is fair to 'assume that a reasonably prudent Internet user would have seen [the notice of the terms and conditions],'" *Id.* at *4 (cleaned up; citations omitted).

Natural Cycles does not provide an exemplar or copy of these emails, nor their full content. Hence, the Court cannot examine the "email's design and content" to assess whether it provided reasonably conspicuous notice of the arbitration agreement. *Cf. Ireland-Gordy,* 2026 WL 594859, at *4 (court analyzed "notice email's design and content" to determine whether there was inquiry notice). Nor did Natural Cycles provide any pop-up notice within the app informing users of the updated Terms. Natural Cycles has not met its burden to show that the email provided reasonably conspicuous notice, and A.S. and S.A. cannot be bound to the updated Terms for this reason alone.

Even where a company sends an email and notes that a prior arbitration agreement would be updated, courts have declined to interpret plaintiffs continued use as acceptance. *Pliszka v. Axos Bank*, No. 24-CV-445-RSH-SBC, 2024 WL 4194338, at *6 (S.D. Cal. Sept. 13, 2024), *appeal dismissed*, No. 24-6273, 2025 WL 3754350 (9th Cir. Dec. 29, 2025); *see also Sifuentes v.*

*Dropbox, Inc.,* No. 20-CV-07908-HSG, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022) ("Even if the email alone could be considered 'reasonably conspicuous notice,' Plaintiff took no action to unambiguously manifest his assent.") Thus, S.A. and A.S. cannot be bound to the 2025 updated Terms—terms to which they did not unambiguously assent.

### C. The 2025 modification cannot retroactively apply to claims that already accrued

Additionally, Natural Cycles reserved the right to modify the 2022 Terms "at any time" and the new Terms would be effective immediately upon posting. Karlsson Decl. Ex. C § 4.1. And the Terms would apply retroactively to claims "arising out of or relating in any way to" the user's access or use of the Services. *Id.* But a modification provision is illusory if an amendment, modification, or revocation applies to claims that have already accrued. *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1432 (2012). ("[A]n arbitration contract containing a modification provision is illusory if . . . a contract change . . . applies to claims that have accrued or are known to the employer.") And what matters is when the claims accrued, not when the case was filed. *Avery v. Integrated Healthcare Holdings, Inc*., 218 Cal. App. 4th 50, 61-62 (2013); *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1474 (2013) (implied covenant of good faith and fair dealing "prevents [a party] from modifying an arbitration agreement once a claim has accrued or become known to it.").

Plaintiffs' claims accrued well before October 27, 2025. A.S. used the app through February 2024, and S.A. used the app through approximately March 2025, both more than seven months before Natural Cycles' modification. Compl. ¶¶ 164, 178. Plaintiffs filed this case on December 4, 2025. ECF 1. Indeed, Natural Cycles asserts that S.A.'s "opening" of the app on January 16, 2026, more than a month after she filed this lawsuit, constituted assent to the 2025 Terms. The 2025 Terms cannot apply retroactively to A.S.'s and S.A.'s claims, either because the modification provision is unconscionable, or because the implied covenant of good faith and fair dealing prevents Natural Cycles from enforcing it.

For these reasons, Natural Cycles has not met its burden to show that A.S. and S.A. are bound by the 2025 updated Terms.

**D. Plaintiffs did not "clearly and unmistakably" delegate the question of arbitrability to the arbitrator**

The 2022 terms do not contain an internal delegation provision. Rather, Natural Cycles argues that the agreement's "call for the use" of AAA Commercial Arbitration Rules, rules that "delegate questions of arbitrability to the arbitrator," alone constitutes clear and unmistakable evidence of delegation. Mot. at 13. It does not.

As noted above, the arbitration agreement itself does not appear until Section 14 on page 10 of the terms. And Natural Cycles did not provide the URL link to the AAA website, a phone number, or any means for the user to obtain a copy of the rules. Karlsson Decl. Ex. C. To be incorporated by reference "[t]he contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.'" *Shaw v. Regents of Univ. of Cal.,* 58 Cal. App. 4th 44, 54 (1997) (citations omitted). Natural Cycles does not guide the user to the AAA rules.

Here, both S.A. and A.S. declare they are unsophisticated parties with no legal training and no experience in reading or reviewing contracts. A.S. Decl. ¶ 3; S.A. Decl. ¶ 3. To find clear and unmistakable delegation here would require concluding that S.A. and A.S., after navigating Natural Cycles' screens, located the relevant Terms of Service, found the arbitration agreement, noticed the reference to AAA rules, figured out where to find those rules (no links or numbers were provided), and located the delegation rule within them. That conclusion "is unreasonable for the average consumer with no legal experience." *Schlueter-Beckner v. SimpliSafe, Inc.,* No. 3:25-CV-01764 (CRB), 2025 WL 2162948, at *8 (N.D. Cal. July 30, 2025) (finding incorporation of AAA rules cannot suffice for an unsophisticated party). "Incorporating dozens of pages of AAA Rules within dozens of pages of [Natural Cycles'] Terms of Service is 'tantamount to inserting boilerplate inside of boilerplate,' and to call this 'clear and unmistakable' evidence of [S.A. and A.S.'s] intent to delegate the question 'would be to take "a good joke too far."'" *Id.* (citations omitted). This Court has cited the *Schlueter-Beckner* decision with approval, though it did not reach the issue. *Rushing v. Williams-Sonoma, Inc.,* No. 16-CV-01421-WHO, 2025 WL 2391394, at *2 n.3 (N.D. Cal. Aug. 18, 2025) (Orrick, J.).

Plaintiffs did not "clearly and unmistakably" delegate the issue of arbitrability to the arbitrator.

**E. The delegation clause specifically and the arbitration agreement as a whole are procedurally unconscionable.**

Plaintiffs address the 2022 Terms, not the 2025 update, which does not govern. *See* Section III.B., *supra*. Even if the Court finds that S.A. and A.S. delegated questions of arbitrability to the arbitrator, the delegation clause itself is both procedurally and substantively unconscionable. Thus, the Court may decide the issue. *Bielski v. Coinbase, Inc*., 87 F.4th 1003, 1010 (9th Cir. 2023) (holding that so long as a party challenge mentions the delegation clause and specifically relates to such clause, "the federal court has a green light to consider those arguments").

Under California law, an unconscionable agreement or provision must be both procedurally and substantively unconscionable. *Armendariz v. Found. Health Psychcare Servs., Inc*., 24 Cal. 4th 83, 114 (2000). The two operate on a sliding scale: the less procedural unconscionability shown, the more substantive unconscionability required, and vice versa. *Id.* at 89. "A party is. . . permitted. . . to challenge the enforceability of a delegation clause by explaining how 'unrelated' provisions make the delegation unconscionable." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 680–81 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 96 (2025) (cleaned up; citations omitted). "In evaluating an unconscionability challenge to a delegation provision under California law, a court must be able to interpret that provision in the context of the agreement as a whole, which may require examining the underlying arbitration agreement as well." *Id.* (*citing Bielski,* 87 F.4th at 1012.)

*First*, the 2022 Terms, including the delegation provision were presented on a take-it-or leave-it basis, with no opportunity for users to opt-out. Karlsson Decl. Ex. C. The agreement is thus a contract of adhesion. *Marron v. HealthSource Glob. Staffing, Inc.,* No. 19-CV-01534-KAW, 2019 WL 4384287, at *8 (N.D. Cal. Sept. 13, 2019) ("Without an opt-out provision, the contract is effectively one of adhesion, and therefore there is procedural unconscionability"). "Some California courts have held that in itself [a] finding of a contract of adhesion is essentially

a finding of procedural unconscionability." *Heckman,* 120 F.4th at 681 (cleaned up; alteration in original).

Natural Cycles argues unconscionability is defeated because Plaintiffs did not allege facts showing they lacked a "reasonably available alternative." They did. Natural Cycles is unique in that "it holds regulatory clearances (including FDA clearance) for the app as a Class II medical device in the U.S." Compl. ¶ 18. "Natural Cycles markets itself as a "privacy-protective, FDA-cleared medical device for natural birth control and fertility tracking. . . and that unlike "free" apps that monetize users' data, Natural Cycles charges a subscription fee specifically to protect data privacy." Compl. ¶ 2. Natural Cycles concedes as much in its concurrent motion to dismiss: "While many businesses seemingly offer similar services. . . Natural Cycles stands apart in two key ways." Mot. to Dismiss, at 4.

In any event, the Ninth Circuit has made clear, "[t]he California Court of Appeal has rejected the notion that the availability in the marketplace of substitute employment, goods, or services *alone* can defeat a claim of procedural unconscionability." *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1283 (9th Cir. 2006) (en banc) (emphasis in original); *see also Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 997 (9th Cir. 2010) ("The availability of alternative business opportunities does not preclude a finding of procedural unconscionability under California law."); *Fisher v. MoneyGram Int'l, Inc.,* 66 Cal. App. 5th 1084, 1097 (2021) (plaintiff "was not required to show the absence of market alternatives to establish procedural unconscionability because he had solid evidence of surprise.")

*Second*, Natural Cycles did not provide the URL link to the AAA website, a phone number, or even a means for the user to obtain a copy of the rules which contain the delegation agreement. Users would be surprised to learn that they would be waiving their right to have a court determine arbitrability. Where the party drafting an arbitration agreement fails to provide the AAA rules and the user is "unaware" of an element of those rules at signing, the failure constitutes procedural unconscionability. *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1246 (2016).

*Third*, the 2022 Terms contain internally contradictory forum clauses that compound the

procedural unconscionability. Section 1.9 states "You and Natural Cycles agree to the jurisdiction of the courts of Sweden to resolve any dispute. . .that arises in connection with these Terms." Karlsson Decl. Ex. C §1.9. The clause contains no caveat limiting it to users outside of the United States. The carveout for U.S. users—that the arbitration agreement "applies only to users in the United States"—appears only once, in boxed text above Section 14. Yet according to Natural Cycles' own preamble, "boxed text. . . is not legally binding." Karlsson Decl. Ex. C (preamble).

A reasonable user would have no way to know whether she is subject to arbitration or subject to the jurisdiction of Swedish courts. And the only way to find out is to file for arbitration—a result no consumer would expect. The internally contradictory clauses present a substantial barrier to understanding the Terms. *Heckman*, 120 F.4th at 683 (finding procedural unconscionability where "the Rules are so dense, convoluted and internally contradictory to be borderline unintelligible").

*Fourth*, the express language of the agreement states "Each party must bear their own fees and costs in arbitration." Karlsson Decl. Ex. C. Plaintiffs allege both monetary and non-monetary claims, and under the current AAA Commercial Rules fee schedule, the filing fees alone come to $4,825.[8] A Natural Cycles user would be surprised to learn that arbitration fees were significantly higher than court filing fees. A user would be surprised to learn arbitration would cost this much, particularly because the Terms neither provide a copy of the AAA rules nor describe how to find the rules, let alone the fee schedule. *See Parada v. Superior Ct.,* 176 Cal. App. 4th 1554, 1571 (2009) (finding procedural unconscionability where a "customer might receive a nasty shock on learning of the amount of fees charged by JAMS for three arbitrators and of the requirement of depositing those fees in advance").

California courts have recognized that where terms do not provide a copy of the AAA rules, list the AAA filing fees, or describe how to find the fee schedule, "the degree of procedural unconscionability may 'rise . . . to a moderate level' when the party drafting the agreement fails to provide a copy of the applicable arbitration rules and the nondrafting party claims to be surprised

[8] *See* Parasmo Decl. Ex. D.

by an element of the AAA rules." *Gostev v. Skillz Platform, Inc.,* 88 Cal. App. 5th 1035, 1056 n.11 (2023) (cleaned up; citations omitted) (procedural unconscionability where "users would be surprised to find that, according to a AAA fee schedule . . ., the filing fee for nonmonetary claims is $6,250 (and this fee does not include arbitrator compensation)").

The 2022 Terms are procedurally unconscionable on multiple independent grounds: they are a contract of adhesion; Natural Cycles failed to provide access to the AAA rules containing the delegation provision; the Terms contain internally contradictory forum clauses; and the fee structure creates substantial surprise. Combined with the substantive unconscionability discussed below, the delegation provision and the arbitration agreement are unenforceable.

### F. The delegation clause specifically and the arbitration agreement as a whole are substantively unconscionable

"The substantive unconscionability inquiry analyzes whether a contractual term is 'overly harsh,' 'unduly oppressive,' or 'so one-sided as to shock the conscience.'" *Rios v. HRB Digit. LLC*, 807 F. Supp. 3d 975, 989 (N.D. Cal. 2025) *citing Sanchez*, 61 Cal. 4th at 910, (citations omitted). "Unconscionability requires unfairness beyond a 'simple old-fashioned bad bargain.'" *Id.*

*First*, the agreement imposes substantively unconscionable cost burdens on consumers through two provisions. The agreement requires arbitration under the AAA Commercial Rules which impose substantially higher filing fees than the AAA consumer rules. Karlsson Decl. Ex. C § 14.1.1.[9] Plaintiffs bring both monetary and non-monetary claims. Under the AAA Commercial Rules, initial filing fees alone would cost $4,825. *See* Parasmo Decl. Ex. D.

In *Fisher,* the court found an arbitration provision substantively unconscionable where it "provided that arbitration would be governed by American Arbitration Association's (AAA) commercial rules, which would make the process more expensive for consumers than the otherwise applicable AAA consumer rules." *Fisher,* 66 Cal. App. 5th at 1105 (finding substantive unconscionability where "the hefty filing fee of $925 required by the AAA Commercial Rules. . . serves as a deterrent to the bringing of consumer claims.")

[9] *Compare* Parasmo Decl. Ex. D *with* Ex. E.

On top of this, the agreement also requires that "[e]ach party shall bear its own costs, fees, and expenses of arbitration." Karlsson Decl. Ex. C. Cost-shifting provisions are unconscionable when they require a plaintiff to pay arbitration fees they would not incur in court. *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1003 (9th Cir. 2021) (requiring plaintiff to "pay half of the arbitration fees, including with respect to the gateway issue of arbitrability, impermissibly imposes a 'type of expense that [plaintiff] would not be required to bear if he [ ] were free to bring the action in court'").

Courts have found cost-shifting provisions unconscionable in the consumer context. *Shahtout by & through Shahtout v. California Psychcare, Inc.,* 562 F. Supp. 3d 913, 925 (C.D. Cal. 2022) (collecting cases). In *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), the Ninth Circuit found that a cost-splitting provision between a telecommunications company and its customers was unconscionable because "it imposes on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court." *Id.* at 1151.

An "arbitration clause should not impose excessive costs relative to the recovery sought." *Gutierrez v. Autowest, Inc.,* 114 Cal. App. 4th 77, 89, n. 9 (2003). Here, the arbitration filing fee is $4,825. The unconscionability of the delegation clause is compounded because the agreement also prohibits the arbitrator from awarding damages. Karlsson Decl. Ex. C §14.1.3. Consumers thus face a $4,825 filing fee for access to a forum where they cannot recover damages. *See Gostev*, 88 Cal. App. 5th at 1062 (finding substantive unconscionability where "the arbitration filing fee for Gostev's nonmonetary claim is $6,250, while the Terms of Service purport to limit damages to $50.")

It is no answer for Natural Cycles to argue that an AAA rule may differ from the agreement's express language. The agreement's express terms control over any incorporated AAA rules. "[W]hen incorporating any set of arbitration rules by reference in an arbitration agreement, [parties] are free to include provisions in conflict with certain provisions of rules incorporated by reference; the specific provisions in the arbitration agreement take precedence and the arbitration rules are incorporated only to the extent that they do not conflict with the express provisions of the arbitration agreement." *See, e.g., Szuts v. Dean Witter Reynolds, Inc.,*

931 F.2d 830, 831–32 (11th Cir. 1991) (vacating arbitral award where arbitration was conducted in a manner contrary to the parties' agreement); *see also Polimaster Ltd. v. RAE Sys., Inc.,* 623 F.3d 832, 841 (9th Cir. 2010) (holding a parties' express agreement effectively overrides general procedural rules of arbitration).

At bottom, the AAA rules cannot cure the substantive unconscionability of Natural Cycles' express terms because consumers see only the express terms at the moment of contracting. *Fisher*, 66 Cal. App. 5th at 1106.

*Second*, the agreement prohibits the arbitrator from awarding damages: "The arbitrator is not authorized to award punitive or other damages." Ex. C to Karlsson Decl. § 14.1.3. This renders the delegation clause and the arbitration agreement illusory. It offers users a forum in which they cannot vindicate their claims. Even if Natural Cycles proffers a different interpretation of "other damages," consumers cannot know at the moment of contracting how an arbitrator would interpret the clause. And under the delegation clause, consumers can only discover that meaning by paying the $4,825 filing fee and submitting the interpretation question to the arbitrator—including whether the agreement itself is enforceable on unconscionability grounds. *Cf. Fisher,* 66 Cal. App. 5th at 1106 ("Perhaps in application this provision may be given the interpretation MoneyGram places upon it, but consumers have no way to know that up front and must simply take the risk the AAA rules would override MoneyGram's fees provision as drafted.")

Even if the provision were read narrowly to limit only statutory and other types of damages, while preserving economic damages—it would still be substantively unconscionable.

Here, A.S.'s and S.A.'s claims under the California Confidentiality of Medical Information Act ("CMIA") and the California Invasion of Privacy Act ("CIPA") provide for statutory damages. Cal. Civ. Code §§ 56.35, 56.36; Cal. Penal Code § 637.2. The CMIA expressly provides that "any waiver by a patient of the provisions of this part . . . shall be deemed contrary to public policy, and shall be unenforceable." Cal. Civ. Code § 56.37. Similarly, CIPA is rooted in strong public policy protections for privacy rights. Cal. Penal Code § 630.

Provisions limiting statutorily mandated remedies are substantively unconscionable

because they violate the "principle that an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1036-1037 (N.D. Cal. 2022) (collecting cases) (citations omitted) (finding substantive unconscionability where provision limited claims "solely to direct damages")

*Third*, the Terms require that "[a]rbitration proceedings will take place in the federal judicial district in the Eastern District of New York." Ex. C to Karlsson Decl. § 14.1.1. "Requiring all users of a mobile app to arbitrate their claims in [New York] regardless of where the users are located strikes us as unreasonable." *Gostev,* 88 Cal. App. 5th at 1061 (holding forum selection clause "contributes" to assessment that arbitration provision is substantively unconscionable) (collecting cases).

Plaintiffs and the proposed classes are all located in California. Compl. ¶¶ 13-16; 220. Requiring them to travel to New York, pay thousands of dollars in filing fees (plus travel expenses, arbitrator fees, and other arbitration costs), and submit to an arbitrator who decides whether they are even entitled to damages under the agreement or whether the agreement is enforceable is patently unreasonable. These terms are unreasonably favorable to Natural Cycles and reflect an effort to create an inferior forum rather than an alternative to litigation.

The agreement is permeated with unconscionability. Severance is not an option and the Court should find the delegation clause and the entire agreement unenforceable. *Armendariz*, 24 Cal. 4th at 124 (declining to sever where the arbitration agreement is permeated by an unlawful purpose). Severance would also create perverse incentives: "companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court." *MacClelland,* 609 F. Supp. 3d at 1046 (finding agreement unenforceable and declining to sever).

### G. Since there is no FAA preemption, the class action waiver is unenforceable under California law

The class action waiver appears in Section 14.2 of the 2022 Terms. Karlsson Decl. Ex. C §14.2. Because the arbitration agreement is unenforceable for the reasons set forth above, the

FAA does not preempt California's *Discover Bank* rule and the class action waiver in Natural Cycles Terms is unenforceable under California law. *Heckman*, 120 F.4th at 690 (*citing Discover Bank v. Superior Court*, 36 Cal. 4th 148 (2005)) ("class waivers are unenforceable when contained in a 'consumer contract of adhesion,' when small damage disputes could predictably arise between the parties, and when the 'party with the superior bargaining power' is alleged to have 'carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money.'")

Natural Cycles' Terms meet these criteria and are therefore independently unconscionable under *Discover Bank* and therefore unenforceable. The Terms are a consumer contract of adhesion. *See* § III.2.E., *supra*. Natural Cycles is alleged to have deliberately concealed its data-sharing practices from large numbers of consumers. Compl. ¶¶ 194-98. And per-plaintiff statutory damages, while not insubstantial, are small relative to the costs of individual litigation. Courts have held class action waivers unconscionable under *Discover Bank* in the context of women's health apps alleged to have secretly transmitted users' reproductive health data to third parties in violation of various privacy laws, including CMIA and CIPA. *Frasco v. Fl Health, Inc.*, 349 F.R.D. 557, 578 (N.D. Cal. 2025) ("unconscionable on procedural and substantive grounds for many of the same reasons as those given in *Discover Bank* and the California cases that followed" and rejecting argument that *Discover Bank* did not apply because damages were in the thousands, since the rule applies "even when the plaintiffs' recovery would not be insubstantial.")

**H. The Court should not stay M.F. and S.S.'s non-arbitrable claims**

As demonstrated above, S.A. and A.S.'s claims are not arbitrable. Separately, Natural Cycles' request to stay M.F. and S.S.'s claims is a discretionary question independent of the motion to compel arbitration and independent of Section 3 of the FAA. *See* 9 U.S.C. § 3. The Court should decline. M.F. and S.S.'s claims are undisputedly not subject to arbitration. Mot. at 2.

Plaintiffs M.F. and S.S. can adequately represent the proposed classes. Staying their claims is not in the interest of justice as time will pass, witnesses forget, and evidence is lost. Courts in analogous circumstances decline to stay claims of those not subject to arbitration. *See, e.g.*, *Avery v. TEKsystems, Inc.*, 757 F. Supp. 3d 973 (N.D. Cal. 2024) (court would not exercise

its discretion to stay claims of the 417 recruiters whose claims were not at issue in company's pending appeal of arbitration decision).[10]

Because M.F. and S.S. are not subject to arbitration, Natural Cycles' assertion that "it would waste judicial resources to simultaneously litigate these issues in Court and arbitration" makes no sense. Mot. at 17. M.F. and S.S.'s claims will be heard in Court no matter what. And an arbitrator's decision on Plaintiffs S.A. and A.S.'s claims has no bearing on the Court's resolution of M.F. and S.S.'s claims. Moreover, arbitration awards are generally confidential. Karlsson Decl. Ex. A; AAA Commercial Arbitration Rules R-45. "[Natural Cycles] cannot have its cake and eat it, too. They cannot, on the one hand, argue that the parties intended individualized adjudication of each plaintiff's claims, and in the same breath, argue that certain individual's actions should be impacted by parallel litigation." *Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 991 (N.D. Cal. 2016) (declining to stay claims of plaintiffs not subject to arbitration.)

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Compel Arbitration, decline to stay proceedings, and deny Defendants' request to dismiss S.A. and A.S.'s Class Claims.

Dated: May 14, 2026

Respectfully submitted,

By: *__/s/ Yitzchak H. Lieberman__*

Grace E. Parasmo (State Bar No. 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (State Bar No. 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
8149 W. Santa Monica Blvd., #611
West Hollywood, California 90046
Telephone: (646) 509-3913

*Attorneys for Plaintiffs S.A., S.S., A.S., and M.F., individually and on behalf of the putative classes*

[10] Natural Cycles reliance on *In re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. 2018) is misplaced. Mot. 17. There, the stay that applied to plaintiffs not subject to arbitration was agreed upon. *Id.* ("Plaintiffs do not dispute that the Court should stay all proceedings if it orders arbitration as to any Plaintiff").